## In re PORTLAND ELECTRIC POWER CO.

No. B–23986.

United States District Court,
D. Oregon.
Jan. 22, 1951.

See also 9 Cir., 162 F.2d 618, D.C., 97 F. Supp. 895, and 97 F.Supp. 897.

Clarence D. Phillips, Portland, Or., for debtor.

Ralph H. King, Portland, Or., for independent trustees of debtor.

Frederick M. DeNeffe, Paul E. Kern, Portland, Or., for Bondholders Committee.

W. Stevens Tucker, San Francisco, Cal., for Securities & Exchange Commission.

Charles A. Hart, Portland, Or., Edgar G. Crossman and Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Guaranty Trust Co.

Justin N. Reinhardt, Portland, Or., for First Preferred Stockholders.

MacCormac Snow, Harry Beckett, Robert T. Mautz and V. Lyle McCroskey, Portland, Or., for Prior Preference Stockholders.

JAMES ALGER FEE, Chief Judge.

Portland Railway, Light & Power Co., an Oregon corporation, in 1907 began acquisition of various utility properties whereby there were furnished street railway and electrical service in the Portland area. All through the changes, the history of this company has been marked by stock manipulation, bond and note issues, holding companies and operations carried out by interlocking directorates.

Portland Railway, Light & Power Co.,[1] under its subsequently adopted name of Portland Electric Power Company, came into this Court in 1939, seeking voluntary reorganization. The only problem now before the Court is whether final release from wardship at this time will enable the entity to take its place in the world of business competition, no longer tutored and no longer protected.[2] Here likewise is a fitting place to review the tale of the initiation of its difficulties, the crises of its life and the consummation of this apparently highly successful reorganization.

During the whole course of its highly colorful career until reorganization, its management has been marked by the finan-

---

1. The entity so variously known will be hereinafter referred to as the "debtor."

2. It must be noted that debtor went through a previous reorganization in this Court. The story may be of value in preventing a return. The roll of such proceedings indicated many returns of once reorganized corporations to the courts.

cial manipulations in the grand style so characteristic of the period. Only so much will be here related as seems necessary to an understanding of the last reorganization. In its early history, we find the debtor dominated by members of a prominent family of the eastern seaboard by reason of large blocks of stock held by them or by their clientele. The first transaction significant to the subsequent time of troubles occurred logically enough in May and June, 1929. At the time, the 112,500 shares of $100 par value stock was expanded to 150,000 shares of no par value common stock. Of 37,500 shares of this expanding issue, after exchange of the $100 par value shares which remained, 21,159 were subscribed by stockholders, and the balance, 16,341, at a higher commission by the underwriters among whom were numbered three members of this family, also directors of debtor. The motivation need not be pointed out. The controlling interest was acquired from or with assistance of members of the family above referred to by Public Utility Holding Corporation of America, which, on January 30, 1930, contracted to sell its holdings to Central Public Service Corporation[3] pursuant to an offer made September 27, 1929. From October, 1929, to March 14, 1930, these two companies jointly, and from the latter date the Central Public Service Corporation alone, dominated debtor.

During the period of domination, debtor was compelled to take action highly detrimental to the interests of its stockholders in these particulars:

(1) issue $16,000,000 convertible debenture bonds;

(2) purchase stocks of Seattle Gas Company;[4]

(3) convey all electrical properties to Portland General Electric Company;[5]

(4) convey all street railway properties to Portland Traction Company;[6]

(5) cause Portland General to issue $40,000,000 first and refunding bonds;

(6) thereafter cause Portland General to issue $7,500,000 gold notes.

These events are outlined under these heads:

(1) While debtor was thus under joint control on February 18, 1930, the last of the dominant family had resigned from the Board and the resignation was that day approved. At the same meeting, issue and sale of $16,000,000 6% convertible gold debentures of the debtor were authorized.

(2) The purchase of substantially all common stock of Seattle Gas, with the proceeds of this issue, was consummated. The debt of this company was thereby increased by $9,000,000, besides thereby bringing on an additional interest charge, including amortization of discount of $562,500, annually. The motivation for this practical venture is made plain when it is stated that the great depression had set in and Central had obligated itself to purchase this stock. The stock thus acquired at $226 per share was in a company which had no earning power and the bonds of which were selling below par. Indeed, the stock was worthless and became in effect a total loss. The twilight began thus to set in.

(3) Central took complete control of debtor and discovered that there was a negative covenant in the convertible gold debentures which prevented further action until appropriate maneuvers had been consummated. In August, 1930, debtor was caused to transfer all of its electric generating and distributing properties to Portland General, receiving all the capital stock of that company in return.

(4) In accordance with an over-all plan, debtor was forced to transfer all of its street railway properties to Traction and received the stock of this new company in exchange. Thus debtor entered the ranks of holding companies, with the evils attendant upon such status.

(5) Thereupon, Portland General was caused to issue $40,000,000 of 4½% bonds, which saddled debtor with an additional debt of $11,054,600 and an additional annual interest charge of $500,000, which practically deprived it of the earnings of its electrical properties. Complete control of

3. Hereinafter called "Central."

4. Hereinafter called "Seattle Gas."

5. Hereinafter called "Portland General."

6. Hereinafter called "Traction."

all the properties was established through a subservient local board.

(6) Thereafter with the primary purpose of raising cash for and of assisting Central in raising funds to meet its obligations, Portland General was caused to issue $7,-500,000 of 4% eighteen month gold notes as of July 1, 1931. The announced purpose was to retire the debenture of Portland General for new construction and to provide additional working capital. But the funds went directly into the coffers of Central to meet its obligations to Chase. After various bookkeeping entries of credits to Portland General and debtor, approximately $2,879,000 was still unaccounted for to Portland General.

These various transactions laid the foundation for disaster to debtor. The subsequent superstructure was completed by a series of events related below. Thereby, the long term outstanding indebtedness of debtor, directly or through the subsidiary, was increased in the sum of over $27,000,-000, of which no more than approximately $7,300,000 was ever made available to debtor or its subsidiaries.

Because of the worries of all concerned over the position of Central, an extremely intricate financial transaction was carried out by virtue of the interlocking directorates. As a result, 127,000 shares of Central Gas and Electric Company stock were transferred to Portland General at a gross over-valuation in settlement of the claims of the latter against debtor on March 31, 1932. In order to give plausible cover, the common stock of debtor, all held by Central, was greatly diluted and increased the debt of debtor to Central. Because of the fact that Central, immediately after acquisition of a controlling share of Debtor's stock, had conducted, with the assistance of Debtor, a high pressure and highly successful campaign for the sale of its own preferred stock and for exchange of stocks in the debtor company held by employees of the debtor and its subsidiaries therefor, and because of the highly complicated financial transaction just out-lined, attention began to be centered upon the affairs of debtor and Central.

As a result of the reaction of the public and the persons who had acquired stock by exchange and to rumors as to this financial transaction, a hearing was held by the Oregon Public Utilities Commission and a report based upon the hearing was issued, which criticized the action of Central and Portland General for the high pressure methods used in effecting sales of this stock and exchange thereof for stock of debtor, already held by employees of the operating and managing company and members of the public. As a result of the pressure of public opinion, Consolidated Securities Company was created and 29,994 shares of common stock of Seattle Gas transferred to it, and about November 28, 1932, an agreement was made whereby Consolidated Securities Company was to protect debtor from liabilities for claims of purchases of Central stock and providing for re-exchange of such stock for that of debtor. These exchanges were generally effected and the beneficiaries became stockholders of debtor. Then to restore some measure of confidence locally in the management of debtor, Central transferred all common stock of debtor under a voting trust, executed November 25, 1932, to three Portland directors. This voting trust carried control of debtor and the subsidiaries.

On January 3, 1933, the $7,500,000, 4% gold note issue of Portland General would have come to maturity. The income was insufficient to provide for payment when due. On December 30, 1932, that company entered into an agreement with The Chase National Bank of the City of New York,[7] with the participation of Harris Trust and Savings Bank,[8] whereby $7,500,000 was loaned to it, payable January 3, 1934. It was, of course, obvious that the loan could not be paid at maturity, and on October 16, 1933, Chase renewed the loan. Each of these agreements, as well as subsequent similar documents, drastically limited the amount of dividends which Portland General could pay to its parent, the debtor.

7. Hereinafter called "Chase."

8. Hereinafter called "Harris."

These dividend limitations were deliberate stations on the time table of prepared debacle.

About the first of the year 1933, Central had gone into voluntary bankruptcy. Debtor filed claim for over $1,000,000 and received 45,000 shares of stock of Consolidated Electric and Gas Company, the reorganized company. Portland General received 53,500 shares of preferred stock of the reorganized company. Central received 51,414 shares of second preferred stock of debtor and voting trust certificates on a block of common. The stock was turned over to officers of debtor, who held it under voluntary trust for retired employees of debtor and its operating subsidiaries.

Anticipating that interest payment due March 1, 1934, upon the issue of convertible debentures, would be defaulted, a receivership proceeding was commenced in this Court, and Franklin T. Griffith was appointed temporary receiver. Debtor then initiated proceedings for reorganization under 77B, a newly enacted amendment to the Bankruptcy Act, 11 U.S.C.A. § 207. An amended plan of reorganization for issuance of $16,581,600 of 6% collateral trust income bonds of debtor was approved by order of this Court March 5, 1935. No vote of stockholders of debtor was taken upon any phase of the reorganization upon the representation to the Court that they were not affected by the proceedings.

The collateral trust bonds were issued pursuant to the approval of the Court. Payment was secured by indenture, pledging all capital stock except qualifying shares of Portland General and Traction, the main subsidiaries of debtor, and subsequently in November, 1935, the remainder of the second preferred stock of debtor left in the treasury was added to the pledges. When the amended plan of reorganization was put into operation, there were renewals of the loan, which were procured to take up the 4% gold notes due in 18 months in the sum of $7,500,000. Such renewals contained restrictions upon the amount of dividends which Portland General could declare upon common stock. There was concealed from the Court, during the entire first reorganization proceeding, the fact that there was to be a limitation on the dividends, which made inevitable a default upon the collateral trust bonds. It is to be noted also that neither the debtor nor any of the subsidairies challenged the validity or legality of the Chase loans. Although there was a formal order reciting the accomplishment of the plan, the proceeding was held open by orders issued at the request of debtor until 1948. This circumstance had repercussions, as will be noted. As a result of the concealed restriction, debtor, as the holder of this stock of the subsidiaries, was effectually deprived of this income and was unable to pay interest on its six per cent collateral trust income bonds, and, in fact, no interest payments were made. The default took place March 1, 1939, because of the accumulation of thirty per cent interest. This event could have been forestalled by a token payment, but apparently those who were in the inner circle decided that events should take their predestined course.

Immediately upon default, Guaranty Trust Company of New York[9] demanded the transfer of the capital stocks of Portland General and Traction, which had been pledged as security for the collateral trust bonds, into the name of Kugler & Co., its nominee under power. The transfer was made on March 10, 1939. This transfer comprised all of the property of debtor considered of any value. This transfer placed absolute control of debtor and its subsidiaries in Guaranty alone. Guaranty thereafter immediately voted the stock in order to *re-elect the existing board of directors*.

Under such auspices, a voluntary petition for reorganization under Chapter X of the Bankruptcy Act was filed April 3, 1939. The petition was referred to The Honorable Estes Snedecor, heard and recommended for approval. Approval was given by the Court. The timing of the default, the limitation of dividends and the transfer of the subsidiary stock, together with the complete control by Guaranty, were factors

9. Hereinafter called "Guaranty."

which set the stage for the second reorganization. These were kept secret and were not included in the recitals of the second reorganization petition and were never directly drawn to the attention of the Court by anyone connected with debtor or its financial backer. The highly favored position thus afforded to Guaranty is not noted in the petition, and in fact was not disclosed for some months. Instead, the petition indicated fear on the part of the debtor that Guaranty would take measures to foreclose on its security. This was a complete misrepresentation of the situation, as Guaranty and debtor were apparently cooperating with the idea that the stock of debtor and its subsidiaries would be sold for cash and that the bondholders would thereby have the opportunity to purchase the properties at a reduced value. Thus in fact, Guaranty had foreclosed on its security and was prepared to take over without compensation to those who had invested money in stock. But the law had made provisions for a reorganization which would protect the rights of all concerned.

Soon after the petition was approved, Thomas W. Delzell and Leslie M. Scott were appointed independent trustees, and Franklin T. Griffith, president of debtor, was appointed operating trustee on May 1, 1939. Robert F. Maguire was selected by the independent trustees as counsel. Scott resigned, and the Court named R. L. Clark to succeed him as independent trustee on August 2, 1939. Thereafter, when Scott's resignation was followed by that of Robert F. Maguire, as attorney, the independent trustees chose Ralph H. King to succeed the latter. Griffith resigned as operating trustee October 4, 1939.

The consummation of the rehabilitation of debtor was brought about by the loyal service, hard work and great ability of R. L. Clark, independent trustee, Thomas W. Delzell, independent trustee, and Ralph H. King, attorney for the trustees, who have served approximately ten years from 1939 to the present date. During this long period of time, contrary to normal expectancy of financially wrecked and bankrupt corporations, a highly successful rehabilitation of this utility was carried out, and it was recreated to play an outstanding role as a private industry in the public sale and distribution of electric power. This result was only possible by use of the judicial and administrative machinery provided by chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501, et seq.

This reorganization is an example of finely balanced cooperation of a court and an administrative body in the solution of an extremely complex modus of fact and law. The process was one of unwinding rather than one of Alexandrian shearing.

The courts of the western states adapted the custom of untutored and boisterous mining communities to the solution of problems of waters and mineral deposits insoluble by ancient common law doctrine. The process was the same as that whereby the royal courts digested and absorbed the rude customs of Saxon swineherds or the commercial practices imported by courts piepoudre and the courts of the merchants at the ports. The Supreme Court of the United States, in an enlightened series of opinions, made this contribution secure. This primary solution led to greater difficulties, which were met in a brilliant way by an amalgamation of the administrative and the judicial process. The facts as to priority of right, abandonment, duty of water and waste were so complex and the judicial adaption so recent that the need for administrative aid became paramount. There was no conflict between these agencies of government. The administrative bodies advanced trigonometric theories and engineering data to synthesize hypotheses relating to aqueous action resulting in scientific solutions which would have been impossible for the courts. The judicial machinery picked up such results, tempered the crusading zeal of experts by moulding the scientific solutions into an amalgam with the traditional liberties and rights of citizens and by refinement obtained pure justice. The arid West has been governed by the results and, though conflict has not ceased, the product is secure.

 Based upon this process, there is no conflict between the courts and the administrative bodies. The ultimate of the judicial process is to square the facts with the

rules of law. But the discovery of synthesis of and adaptation of the facts in accordance with economic practice is the function of the administrative bodies.

The reorganization technique replaced the old equity receivership, which was woefully inadequate, and adapted the lessons learned in previous history of the necessity of administrative and judicial cooperation. The lack of control, the inability to discover what the situation was, and the futility of resistance by legitimate objectors marked the equity procedure as moribund. However, it did not mark a failure of the judicial process. If proper machinery is supplied, the trial courts can cope with any possible situation. Instead of making apologies for failures and inefficiency, the trial courts should, by development of new devices, keep abreast of changes in the economic and political situation.

The Congress, however, supplied the machinery for mastery of the problem, which was the relict of the failure of the cumbersome and inefficient equity receivership. This was done by the adoption of § 77B of the Bankruptcy Act. Practice under that statute proved that the idea was correct but there were still lacunae of inefficiency. The present Chapter X is the result of experience under the former enactment, which gave the courts the advantages of results obtained by an extremely effective administrative body. This has proved one of the most brilliant devices for solution of the complex ramifications of corporate financial problems.

The Court could not effectively administer such a complicated conglomeration in which the elements were graudually shifting, even with the assistance of the findings of the Securities and Exchange Commission and the control by the independent trustees and their attorney, unless the Court dealt with judicial problems alone.

The Court, at the outset of the reorganization, was required to rule upon various questions which established policies which have been controlling throughout the proceeding. These preliminary rulings will be summarized below.

First, upon objection, it was held that the Court was not an adjunct of the federal administrative bodies, but was a judicial tribunal with full responsibility for determining the law and the facts upon adverse presentation. This holding had important ramifications.

(a) Based thereon, it was directed that all matters arising during the course of proceedings, important enough to require a ruling of the Judge, should be initiated by written petition or objection of some one concerned, and presented in open court. The Court, after appointment, took no responsibility for the acts and positions of the independent trustees or the committees of stockholders and bondholders. All necessity for conferences were thus eliminated. It was directed that a complete written record be kept of all proceedings which were thus in open court.

(b) It was obvious, however, that, in the day to day management of properties of this magnitude, innumerable problems would arise. Over objection that the Federal Rules of Civil Procedure, 28 U.S.C.A., were applicable, and it was there laid down that references should be the exception, this Court held the circumstances hereinafter detailed compelled a reference.

The Court very positively maintained the position that the courts were not required to echo the findings of the administrative body. This first came up over the appointment of trustees, which was adjudged binding upon the entry of the order even without the consent of the Commission. The administrative body voluntarily relinquished to the Court the power of fixing interim and final allowances of the trustees and attorneys, and did not attempt to set maximum amounts. All during the course of the proceeding, however, hearings were had in open court before the Special Master,[10] at which the advice and suggestion of the administrative body were sought and considered by him. On final allowances, the Commission compiled

10. See for procedure opinion dated June 24, 1940, D.C., 97 F.Supp. 873.

detailed analyses of the nature and extent, the relative importance and inter-related value of the services of each applicant. The recommendations of the Commission were exceedingly helpful to the Special Master and the Court. There was a hearing upon this before the Special Master and, upon exceptions, a hearing before the Court. The spirit of the recommendations of the Commission was carried out.

The major field of conflict was that of valuation. Since this bastion was the key position in the resolution of all diverse claims, the struggle was waged without quarter asked or given. The Court was adamant that the question was justiciable. And indeed, it proved necessarily so! The independent trustees took the impregnable position that the valuation could not be set by compromise between conflicting claims by officials appointed in the interests of the public. The Court approved. By hearings before the Securities and Exchange Commission and in open court, a valuation just and equitable was obtained. Of course, it was impossible to recoup the loss by mismanagement and maneuvering of the fabulous era of high finance.

The Court insisted that, so far as possible, all matters should be handled preliminarily before a Special Master. Inasmuch as the Referees in Bankruptcy had not yet been put on salary, there was some difficulty in that regard. Objection was suggested that the policy of the Civil Rules is applicable in bankruptcy and that, therefore, there should not be a general reference to a master. The Court held that no such abstract pronunciamento should control a court faced with an intensely practical situation. In a reorganization proceeding, there are day to day orders and general control of the business which must be exercised by the court which is the clearing house under the statute. To exercise efficiently such control requires close touch and constant supervision of minute detail. The function is administrative and consultative, rather than strictly judicial. The requirement that this function be performed by a judge savors of the ignorance of trial court operations, which often characterizes legal theorists and members of appellate courts. In any event, this was the course of action which was followed and which was highly successful. Rulings of the judges were only required at crossroads of policy. The detail and routine of daily determination were handled by the Special Master. Luckily, The Honorable Estes Snedecor (now permanently Referee in Bankruptcy for Portland and vicinity), who is one of the outstanding experts in this field, was available for designation as Special Master. Under his meticulously careful guidance, reinforced by his sound legal talents, the reorganization proceeding was brought to fruition. His reports, which were comprehensive and lucid and which bespoke verity, enmirrored faithfully the complex problems and suggested tentative solutions therefor.

(c) Although the Court meticulously followed the statute which places certain matters within the competence of the Securities and Exchange Commission or the Federal Power Commission as to approval or disapproval upon certain factors, the Court held, in the first instance and thereafter consistently over objection, that all questions must be passed upon judicially. This position was vital regarding valuation of the properties and the allocation of the proceeds.

Second, the Court held, at the outset and over objection throughout the proceeding, that all property of the debtor was within the jurisdiction of the bankruptcy court and that all persons or corporations having an interest in the property were parties to the proceeding. These rulings had vital repercussions. The control of the subsidiaries was affected thereby, as was the question of obstruction of a court order.

The problem had tremendous proportions. As a result of the transactions of 1930 and 1931 above sketched, debtor and Portland General had been required to issue long term debt securities, which had increased the burden of debt by $27,619,600 par value.

These issues were debtor's $16,000,000 of gold debentures, Portland General's gold bonds 4½% series $40,000,000, and 4% gold note issue of $7,500,000. The total of Portland General's indebtedness was

about $47,500,000, and the annual interest requirement was over $2,000,000. Debtor's issue of $16,000,000 was replaced by the 6% collateral trust bond issue of $16,581,-600, of which Guaranty was the trustee. Traction was indebted in substantial amounts for electric trolley busses purchased for operation on a number of its lines.

The stock of debtor and the subsidiaries was held in the manner now set forth. Debtor owned all the stock of the operating subsidiaries, Portland General and Traction, and of Cazadero Real Estate Company and White Salmon Company.

The stock of debtor was held as follows:

| | |
|---|---|
| Prior Preference | Held by public |
| First Preferred | Held by public |
| Second Preferred | Held by its |
| Common | officers as trustees |

The trustees were required to adopt techniques and methods of solving these problems, and first were compelled to determine whether (1) the business was to be liquidated, either piecemeal or at one time, and the debts paid off, or (2) the property was to be continued as a going concern. The first step was a clarification of the financial position of debtor. The position of Guaranty was consistently that the properties should be disposed of and the bondholders paid in cash. Although the attitude of the policy makers of debtor was ambiguous throughout the procedure, apparently they believed the position of Guaranty was sound and that the pound of flesh should be demanded. In line with this idea, both Guaranty and the governors of debtor were apathetic if not hostile to attack upon the transactions of the past, notwithstanding the evidence that assets of debtor had been siphoned off and concealed. Similarly, there was a disposition to defend outmoded methods and inaccurate policies of debtor and its management. The policy of the independent trustees to rehabilitate through economies in operation and in savings would have thus been frustrated. At the outset, the problem of control of the debtor and its subsidiaries was shrouded by the camouflage with which it had been invested, but before long its outlines emerged in bitter relief. Throughout the proceedings, Guaranty asserted and vigorously defended the right to control and vote the pledged stock in all matters. This problem of control affected the relations of debtor with its board, with Guaranty, with the stockholders and bondholders, with the administrative bodies, federal and state, and with the public. The problem of valuation of the assets and distribution thereof was inherent in the proceeding itself. The attitude of Guaranty has been noted. The independent trustees insisted upon their right to administer all the property of debtor, no matter under whose nominal control it was, and accomplished this by negotiation or by direct methods and, when these failed, by petitions to the Court or formal litigation.

An outline of the proceedings while the property was in the custody of the Court is now necessary.

In May, 1939, Griffith, as operating trustee, determined to abandon operation of the interurban railway system, because under his management about $5,000 a month was continuously lost thereby, and petitioned authority therefor, in which petition the independent trustees, Scott and Delzell, were persuaded to join. During the hearing, Clark and Delzell, then the independent trustees, determined that, with proper management, these losses were unnecessary and assumed direct control and responsibility for operation. As above noted, Griffith then resigned as operating trustee. At the end of the following year, as a result of economies, interurban operation showed a substantial profit instead of a loss. The trustees realized in net profits about $609,000 before sale in 1946.

But this was only an introduction to the economies initiated by the trustees and placed in operation in fields where they had a free hand, as in Traction and in the sale of nonessential and nonoperating property, or forced upon unwilling management of Portland General, backed by Guaranty. The trustees, in order to discover places where savings and economies could be effected, investigated supposed irregularities in accounts of debtor and Portland Gen-

eral with Hawley Pulp & Paper Co. and with Firtex, in the sales of scrap by Portland General and Traction, in the acquisition of motor busses and other equipment by Traction and in the placing of insurance, and many other matters. Elaborate studies of comparative operating costs were made.

The energy and tact of the independent trustees in handling labor relations and problems were marked and contributed to the success of the operation.

In July, 1939, the voting trust of the common and second preferred stock was, at the request of the independent trustees, dissolved. The second preferred stock, held by the officers, was then cancelled.

The preferred position of Guaranty has been noted. This was obtained by the transfer of the stocks before filing of the petition for reorganization. But it became obvious that conflict would arise because of the reforms and economies proposed by the independent trustees. These officers therefore attempted to vote the stock of the subsidiaries on October 3, 1939, after they had discovered the transfer to Kugler & Co., nominee of Guaranty. The latter immediately thereafter appealed to the Court in January, 1940, to restrain the independent trustees from attempting to vote the stock of subsidiaries. While this proceeding was pending, Guaranty, based upon conferences of its officers with the governors of debtor, indicated that there would be elected a Board of public spirited citizens. Upon this suggestion, the Court did not disturb the control which was then exercised by Guaranty and compelled the independent trustees to carry out their policies by indirection, by example, by counsel or by direct court proceedings.

At or about the same time, the independent trustees initiated action against the Central Public Utility Corporation to recapture 21,000 shares of Central Electric & Gas Company, transferred to Consolidated Public Utility Corporation for services alleged to have been rendered Portland General by Central. The independent trustees contended that no services of value had been rendered. Of this they were unable to convince the Court, and, after

trial and appeal, the issues were determined against them in June, 1944.

The first major conflict arose over the threatened renewal by Portland General of its notes held by Chase and Harris in the then total amount of $5,492,600. Preliminary investigations by the independent trustees and their counsel had led them to believe that the original indebtedness evidenced by said notes had been induced through fraud and misapplication of funds by or with the knowledge of said banks and that the notes should not be renewed until all facts had been fully investigated. Since both debtor and Portland General were under direct control of Guaranty, the reluctance arose there. Lip service was given to the attempted litigation, but disparagement and obloquy were heaped on the independent trustees and their counsel for dogged determination to fight out what was proclaimed a last hope and a futile adventure. This bitter opposition was continued throughout the course of the proceeding. The management of Portland General insisted upon renewal to prevent a default and the possible sale of the collateral held by the banks, which included Portland General and Consolidated Electric and Gas shares, pledged to secure gold notes. Since no agreement could be reached on May 29, 1940, the trustees filed a petition and on June 7, 1940, obtained an order of this Court enjoining the officers of Portland General from renewing the notes or making any payments thereon and enjoining said banks from selling said collateral. As a result of this action upon the part of the independent trustees, Chase, as trustee of the collateral pledged to secure said notes, on August 8, 1940, instituted a suit known as Civil No. 427 in this Court for the foreclosure of said collateral. The independent trustees were permitted to intervene as defendants in the suit and filed an answer on behalf of themselves and Portland General alleging lack of consideration and a set-off in the full amount for damages on account of fraud and misapplication of funds. Later, the independent trustees instituted in this Court a suit against Chase under Civil No. 962, seeking

to recover losses sustained by the debtor and Portland General in connection with various issues of securities put out by Portland General during its domination by Central.

It had by this time become obvious that the companies involved should not be sold on the block until the economies and results of recovery litigation were known. It was also obvious that a considerable time lapse was involved. The independent trustees and their counsel thereupon applied to the Court for interim allowances. The Securities and Exchange Commission had yielded to the Court the power of ultimate determination of the amounts of compensation. At all times, however, viewing the course of the proceeding, the recommendations of that body were given great weight although the Court accepted the ultimate responsibility. The fixing of interim allowances was an absolute necessity.

There are two comments worthy of note:

First, the independent trustees' petitions for interim allowances were publicly heard periodically by the Special Master, after notice. His report was based upon testimony and made after consideration of the recommendations of the Securities and Exchange Commission.[11] At these hearings, stockholders of various classes presented objections to the payment of fees to the independent trustees and their attorney. The supreme indifference of the stockholders to mismanagement, waste of money which they had invested, and financial juggling by officers of companies to whom they themselves had entrusted money, was matched only by the virulence of their criticism of the lapse of time and expenditure of money in the administrative and judicial attempt to protect them from the consequences of their own folly.[12]

Second, the officers of Guaranty, while perfectly willing to pay high salaries to the officers of debtor and the subsidiaries, because they cooperated, filled the air with caustic comment to the effect that the reorganization would not be closed because

the independent trustees and their attorney were continuing the operation by obstructive tactics in order to prolong the payment of these allowances.

On November 15, 1940, there was an initiation of an attempt, by a meeting in Guaranty's New York office, to organize a bondholders committee, which took form in April, 1941. Formal recognition was given by the Court after approval of the Securities and Exchange Commission, on December 5, 1941. This committee in general followed the course of Guaranty as opposed to the stockholders and independent trustees, but usually worked independently. The Court recognized a preferred stockholders committee July 3, 1940. The remarks of the Court do not apply to stockholders who were affiliated with this group or its successor, since these cooperated vigorously with the independent trustees.

It was early urged by the preferred stockholders committee and later by the prior preference stockholders committee that the prior proceedings in reorganization of this corporation had never been properly concluded and that there was fraud in that the Court had not been advised as to the actual method of refinancing debtor. It was therefore claimed in various proceedings in the present reorganization, especially in one filed in the former proceeding on October 31, 1942, that the two reorganization proceedings were in actuality one and the same, and that Guaranty had no right, without the consent of the Court, to take over the stock of debtor by and through its nominee, Kugler & Co., and that the control of the stock and the management of debtor and its subsidiaries were lodged in the Court through the independent trustees.[13] Guaranty vigorously opposed these petitions and attempts to give the independent trustees direct management and control of debtor and its subsidiaries by virtue of consolidation of the proceedings or otherwise.

During the first two and one-half years to 1943, the trustees and their counsel con-

---

11. See opinion dated June 3, 1943, D.C., 97 F.Supp. 877, and opinion dated December 13, 1943, D.C., 97 F.Supp. 885.

12. See opinion dated June 5, 1944, D.C., 97 F.Supp. 886.
13. See opinion dated June 3, 1943, D.C., 97 F.Supp. 875.

ducted extensive examinations and investigations under Sections 21 sub. a and 167, 11 U.S.C.A. §§ 44 sub. a, 567, into past transactions involving the management, control and financing of the debtor and its subsidiaries, particularly transactions occurring between 1929 and 1932, when control of the company was acquired by Public Utility Holding Corporation of America and transferred to and held by Central. Also, depositions were taken in preparation for the trial of the issues between Chase and debtor and Portland General. The disclosures emerging from these investigations finally induced the firm stand which the independent trustees and their counsel took in the litigation with Chase.

The ramifications of these investigations extended into the financial entanglements of Central and its affiliated corporations and the varied financial dealings with Harris, Forbes & Co., Chase Securities Corporation and Chase. Guaranty was frankly contemptuous of the efforts in this regard and vigorously opposed them. Great praise must be given to Mr. King for his untiring effort, without assistance of and over opposition of debtor and Guaranty, in discovering uncontroverted evidence of the dealings herein outlined by legal process from adverse and hostile sources. Courage and dogged determination were here required, and he possessed these qualities. The attitude of Guaranty was logical because, if recoveries were made, the valuation would be raised.

Because of the thesis of the independent trustees that the dealings of Central and the Chase and Harris banks were improper in respect to the debt of debtor to these institutions, there ensued vigorous prosecution of investigations, notwithstanding the active opposition of the boards of debtor and Guaranty, as above noted. The trustees and their counsel, by injunction, forced Portland General to refuse to renew the Chase notes. Thereby Chase was compelled to bring suit to foreclose its collateral. Defenses and counterclaims were interposed by the trustees. The trustees,

by their attorney, brought action to recover losses claimed to have arisen from Portland General's issue and sale of $40,000,000 in bonds, the $7,500,000 of gold notes, and debtor's issue and sale of $16,000,000 in debentures.

This litigation extended over four years and involved 224 days in the taking of depositions, the examination of 80 witnesses, 14,362 pages of transcript and 7,714 exhibits.

On November 18, 1941, one of the key questions of the reorganization came prominently into the foreground. Difficult as were the other problems, when valuation was settled, disposition of the other matters could be smoothly made.

The Securities and Exchange Commission and representatives of various classes of stock, Guaranty and the independent trustees developed irreconcilable differences in this field.[14] "In all, over 38 days of hearings before the SEC, with 391 exhibits marked and 4,710 pages of transcript, and 52 additional days of hearings before the Special Master in the District Court were devoted to the reception of evidence from 27 witnesses, with 221 exhibits marked and 4,939 pages of transcript, and arguments on plans and valuation."

The bondholders originally estimated the assets at $13,127,330, while Guaranty's valuation was $19,205,989. The Securities and Exchange Commission administratively evaluated the assets at $22,273,646 on December 31, 1942. The final value upon which the reorganization plan was consummated totaled $41,000,000. Considering the increase of valuations when the price of Traction and the interurban system became fixed by sale, the figure approximated that set by the independent trustees shortly after the initiation of the proceeding.

At the time the reorganization proceeding was initiated, the difficulties of debtor had been anticipated in another field. The Bonneville Power Administration attempted to acquire the properties at salvage values in order to extend the domain of public power and discredit private management. Portland General had been un-

14. See opinion dated September 6, 1944, D.C., 97 F.Supp. 889.

able to obtain a firm contract to supply its power requirements, which aggregated more than fifty per cent of its own generating capacity. Portland General was placed upon an utterly insecure but successfully operated day to day basis. Even at this, Bonneville Power Administration threatened cut-off at various critical times, unless a firm contract for a long period of time were entered, which included an option to purchase the properties under conditions which would have resulted in sacrifices of all the gains built up during the reorganization. The independent trustees and their attorney valiantly opposed this attempt and engaged in litigation,[15] which eventually frustrated the purpose.

The stockholders committees vigorously opposed Bonneville's plan "to scrap," as they said, these going utilities. They organized a publicity campaign against Bonneville's program for the public ownership of utilities. Their counsel made an attempt to bring officials into the hearings of the Securities and Exchange Commission at Philadelphia, and later cross-examined the Administrator and members of the staff in such a hearing. At another time, witnesses were produced before the Securities and Exchange Commission on this issue. When Bonneville was insistent upon the option provision in the proposed power contract, the committee again filed a petition to bring Portland General into the reorganization. This was subsequently withdrawn.

In January, 1943, Portland General reported annual savings of about $500,000. These were largely due to economies made as a result of the initiative of the trustees or irregularities eliminated by them. As a further internal adjustment tending to make the companies operate independently, the independent trustees proposed to increase the power charges of Portland General against Traction, in order that these should more nearly represent the actual value thereof. This was viewed with disfavor by debtor and all the satellites, but was eventually accomplished and was a major factor in the emancipation of both companies.

The officers of debtor petitioned the Court in 1943, as they had many times before, to reopen the decree of closure in the former reorganization for the purpose of allowing the exchange of debentures still outstanding for collateral trust income bonds, as permitted by the plan approved therein. The Court approved the petition and reopened the decree.[16] This raised the curtain for another dramatic proceeding. On October 28, 1943, there was an amended petition of the prior preference stockholders attempting to consolidate the former reorganization, specifically charging fraud in the concealment of the inevitability of the instant proceeding and praying that bondholders be limited in participation to the amounts actually paid for the security involved. The Court held,[17] upon the 13th day of June, 1944, that these questions were still open but that the Court would allow the reorganization to proceed while these were held in abeyance until some practical problem required solution of such contentions.

In 1943, also, there began to be some slight suspicion that there might be some recovery even on first preferred stocks. This contingency required a reorganization of the stockholders' committee. As a result, the Prior Preference Stockholders' committee was recognized by the Court September 1, 1943.

All throughout the proceeding, the independent trustees made every effort to coordinate their efforts with the public administrative bodies and officials and the public at large. There was no disposition upon their part to raise questions of jurisdiction, but to see that the public interest was served. To this end, these officers cooperated so far as possible with the committees of bondholders and stockholders, outside financial interests, taxing bodies

15. See opinion Portland General Electric Co. v. Raver, dated April 29, 1946, D. C., 97 F.Supp. 892, and opinion Delzell v. Raver, dated April 29, 1946, D.C., 97 F.Supp. 893.

16. See opinion dated June 3, 1943, D.C., 97 F.Supp. 875.

17. See opinion dated June 13, 1944, D.C., 97 F.Supp. 887.

and agents, the regulating authorities such as the Securities and Exchange Commission, the Federal Power Commission and the state authorities, including the Public Utilities Commissioner.

However, during the course of the proceeding in reorganization, Portland General was an operating utility which had been under the control of the Public Utilities Commissioner of Oregon. This official assumed that his jurisdiction continued even though the utility was under control of the federal courts. An attempt to make adjustments of the rate base and to set the permissible earnings was initiated. This included phases as to depreciation reserves, excess war earnings, write-offs directed by the Federal Power Commission and earnings effected by filing consolidated tax returns. The independent trustees assisted these efforts, but in one instance asked this Court for a restraining order against the Public Utilities Commissioner and board of Portland General, which had indicated a disposition to make improper concessions not supported by the facts and to the detriment of debtor, and was opposing retention of permissible earnings and rate adjustments. The Court refused to enjoin the action of this sincere public official, but by order placed the control of the proceedings in the hands of the trustees to the exclusion of the board of Portland General.[18] Thereafter, satisfactory adjustments were made without raising the question of the state and national authority over a utility under control of the bankruptcy court. Settlement of these problems laid the basis for satisfactory refinancing of Portland General.

On June 13, 1944, the Court, while affirming the position of the independent trustees that power to vest the management of the subsidiaries existed, reserved the question raised by the stockholders as to whether the instant proceeding and the former reorganization were one and the same. A deserved compliment was paid to Guaranty for the highly successful management of the subsidiaries of debtor under boards nominated by it.[19]

In the meantime, the independent trustees had not lost sight of the central objective of the proceeding.

Suggestions for plans of reorganization were called for, to be filed with the independent trustees not later than July 15, 1942. Plans proposed by the independent trustees, Guaranty, the Bondholders Committee and the Preferred Stockholders Committee were considered by the Securities and Exchange Commission following hearings conducted in the fall of 1942 and spring of 1943. All plans were rejected by the Commission in its findings and order of July 1, 1944. In August, 1944, Guaranty submitted a plan in accordance with the outline of a possible plan suggested in the Commission's findings and opinion of July 1, 1944. After being amended and a hearing thereon, Guaranty's amended plan of October 16, 1944, was approved by the Commission in its findings and order of December 7, 1944.

The bondholders committee had, in 1943, developed a realization corporation for the realization of assets. This was toyed with by the independent trustees and was incorporated in Guaranty's plan of October 16, 1944. After this plan became obsolete, as will hereinafter be related, the bondholders committee attempted to have approved Guaranty's plan of August 15, 1945, and its alternate plan of November 17, 1945.

Constant efforts were put forth by the independent trustees to improve the financial situation of the subsidiaries. Early in 1944, the independent trustees secured the approval of the Court to proceed with studies looking to the refinancing of Portland General. This contemplated a saving of $600,000 to $900,000 annual interest, to be effected by refunding bonds of Portland General. Guaranty looked upon this plan with but little interest, and the board of Portland General was also apathetic and at times definitely hostile. The restrictive covenants in the loan agreements with Chase presented definite obstacles to the carrying out of this plan. As eventually consummated after the board of Portland General yielded, the terms were even more

---

18. See opinion dated November 29, 1943, D.C., 97 F.Supp. 877.

19. See opinion dated June 13, 1944, D.C., 97 F.Supp. 887.

advantageous, since the income of Portland General was doubled and interest and income deductions totaled $1,231,000. This fortunate result was attained in connection with the settlement of the litigation with Chase, and was accepted by Portland General and the independent trustees on December 13, 1944, subject to approval of the Court. In February, 1945, a settlement of all litigation with Chase was approved by this Court, resulting in direct benefits to Portland General and debtor appraised by the trustees at $3,078,484. In addition to this direct gain, the settlement resulted in the following benefits: (1) Released all collateral deposited with Chase and the general mortgage lien held by the bank. (2) Portland General received commitment from Chase for a loan of $5,500,000 on one to ten year serial notes at 2% per annum and no commissions or other charges. (3) Released sufficient funds to enable Portland General to recall its remaining first mortgage 5% bonds totaling $3,171,000. (4) Cleared the way for Portland General to refund its other fixed indebtedness at substantially lower interest rates. (5) Increased the net income of Portland General by reduction of fixed charges, thereby increasing the valuation of its stock. (6) Forced withdrawal of Guaranty's plan approved by Securities and Exchange Commission October 20, 1940, at a valuation of debtor's assets of $27,000,000.

Prior to consideration of this plan by the Court, the settlement of the Chase litigation eliminated the necessity of an adjustment trust, and so enhanced the values of the estate that the pending plan became obsolete. After the favorable refunding of the indebtedness of Portland General, the trustees submitted an Amended Plan, a First Alternative Amended Plan, and a Second Alternative Amended Plan, and Guaranty submitted a Revised Plan and an Alternative Plan, all based on evidence introduced in extensive valuation hearings held before the Special Master in Portland in December, 1944, and January and February, 1945.

The existence of this transcript should be explained. Inasmuch as it appeared to the independent trustees that the Court would eventually be required to settle the valuation, they desired to have a record made under judicial auspices so that it would serve the administrative bodies and the Court equally in the final determination. The Court accepted this view of the matter and set the hearing before The Honorable Estes Snedecor, Special Master, in December, 1944. The hearings were continued into February, 1945. The transcript and the exhibits of that proceeding were used by all parties, the Securities and Exchange Commission and the Court in arriving at the values used and approved in the successful plan.

As noted above, there were differences in valuation of the assets of debtor and its subsidiaries. The trustees and their counsel early set a very high value thereon, which was eventually justified. They themselves assisted in this vindication by economies in costs of hydroelectric generation, transmission and distribution, payroll and personnel adjustments, regrouping of departments, consolidation and eliminations. This record was continued, and indicated that the annual savings of Portland General were $795,000, and that the operating economies of Traction were $120,000 in the year 1945.

The independent trustees filed a Second Alternative Amended Plan of Reorganization (and a First Alternative Amended Plan of Reorganization) both predicated upon a valuation of $40,000,000. The Securities and Exchange Commission held a hearing upon these plans together with a revised plan of Guaranty, filed August 20, 1945, at which the record made at the hearing ordered by the Court was used among other matters, and upon January 14, 1946, issued findings, opinion and order using a valuation of $40,300,000, thus reflecting the settlement of litigation and the gains effected by economies. The independent trustees' second alternative plan was thereby approved. The Commission likewise indicated that the plan be amended to reserve the right, subject to approval by Commission and Court to sell the capital stock of Portland General and Traction. This amendment was made. Thereafter, Traction was sold, with appropriate author-

ization, for $6,966,750 cash. At the same time, the properties of the interurban electric railway division of debtor were sold for $1,000,000 cash, as a result of the demonstration of its solvency and earning capacity heretofore noted. Inasmuch as the governors of debtor had been willing at the outset to sacrifice and abandon these lines, the capacity of the independent trustees was demonstrated.

The negotiation for sale of these utilities almost fell through at the end. Owing to unsettled financial conditions, the purchaser in the contract made with the independent trustees attempted to withdraw at the last moment. But the independent trustees frustrated this move by proceedings before the Court. On the final day, a strike of the employees was called in early daylight hours, but was settled by the skilled diplomacy and prompt action of R. L. Clark, of the independent trustees. The sale was consummated August 29, 1946.

Guaranty had been insisting through the hearings that the valuation was improper and that the Portland General stock should be sold and the bonds paid in full with distribution of stock for the residue. This suggestion seemed to display a singular obtuseness as to the effect of such an operation upon the market and a callous attitude as to the other investors. Neither the Securities and Exchange Commission nor the Court paid attention thereto. No appeal was taken. The bondholders committee opposed the efforts of Guaranty to obtain court authority for the sale of all or part of Portland General stock on the ground that heavy tax liabilities would be eventually assessed on the sale.

At the other extreme, certain groups of first preferred stock, without regard to the realities, made the point that the sale of Traction and the interurban properties proved that the valuation set was not adequate, and urged that the accrued dividends upon the prior preference stock, made by charter prior to first preferred, should be considered subsequent to the obligations which they held. The Court overruled this contention. The Court of Appeals for the

Ninth Circuit, in White v. Portland Electric Power Co., 162 F.2d 618, approved this ruling. The last petition for certiorari lapsed in the Supreme Court of the United States. Watson v. Portland Electric Power Co., 332 U.S. 837, 68 S.Ct. 217, 92 L.Ed. 410.

After the Securities and Exchange Commission had approved the trustees' second amended plan with the amendments, as directed upon consummation of the sale of the interurban properties and Traction, the Court ordered submission of the plan to the franchise of bondholders and stockholders.[20] Under the supervision of the Court the pros and cons of the matter were carefully presented in the material sent out to the approved list of parties interested. At a sag in the market and before the period for voting on the plan had closed, Guaranty issued a statement indicating the reasons for opposing the plan and intimating that it not be adopted by the bondholders. While the plan was under submission to the appropriate electorate, the independent trustees reiterated to the Board of Portland General that an announcement of an appropriate dividend policy for the future should be seasonably made. This was not done, and there were rumors and suggestions that it could not be done. The bondholders committee had sincerely attempted to have the plan approved, and, when Guaranty indicated an intention to issue a statement of its reasons for opposing the plan, the bondholders committee itself issued a letter urging acceptance. Because the plan had been voted for by an overwhelming number of the prior preference stock and by two-thirds of the first preferred stock, which, of course, took the greatest loss, but had not yet obtained a two-thirds vote of the bonds by a narrow margin, the Court was of opinion that this unwarranted interference had prevented a proper expression of opinion and, on petition of the independent trustees, extended the voting period.

The failure to announce a dividend policy and the issuance of the statement were the bases of two separate proceedings in which the independent trustees carried the bur-

20. See opinion dated February 6, 1947, D.C., 97 F.Supp. 896.

den: The first was an attempt again to grasp the control of the operating subsidiary, Portland General,[21] the second a contempt proceeding against Guaranty and certain officers and agents. At the hearing upon the latter, a powerful and effective presentation was made by Theodore Kiendl, Esq., of Davis, Polk, Wardwell, Sunderland and Kiendl, who appeared for the first time therein before the Court in this case. Based upon this argument and showing, the Court held that, although plenary power existed to discipline lawyers and litigants in such a situation, Guaranty and its advisers were acting in the best interests of their clients but had misconceived the proper functions of the administrative bodies and the Court in administration of property and entities in reorganization in bankruptcy. The second proceeding was thereupon dismissed.[22]

The other phase proved to be abortive. While the matter was pending, the Board of Portland General made an announcement of dividend policy and passed a dividend to be paid upon stock to be issued, accompanied by a gloomy prognostication. Before the current period of extension, the plan had been adopted by much more than the requisite quota of votes in each class. It would have been futile, of course, at that point to order the control of the operating subsidiary to be transferred to the independent trustees. The plan contained a provision for the selection of the Board of the reorganized company by the Court. Likewise, the plan provided for the relative participation of bondholders, prior preference stockholders and first preferred stockholders. Second preferred stockholders were, of necessity, completely eliminated. The Court confirmed the plan on October 11, 1947. Thereafter, debtor was abolished as a holding company, and Portland General, the operating company, became the reorganized entity.

There was a provision that the reorganization proceeding should continue in effect for at least fourteen months after the order of confirmation. It was also stipulated that the Court should appoint a new board for the utility, in order that it should operate efficiently after it had escaped from wardship. The Court appointed R. L. Clark and Thomas Delzell, whose unflagging zeal had made the reorganization possible, to represent the interests of those allied with the independent trustees, James H. Polhemus to represent the interests of those connected with the debtor. The balance of the board members were leading citizens of the communities served by debtor, who accepted appointment as a public trust, in many instances at extreme inconvenience and loss to themselves. These public spirited citizens were: William C. Christensen, Wade Newbegin, Ralph Thom, Sidney F. Woodbury, Lloyd J. Wentworth, John A. Zehntbauer, Henry F. Cabell and James J. Walton.

Application for compensation for services and reimbursement for expenses, including those of the Special Master, total $1,555,756.19. Upon due notice, extended hearings were held on the bulk of these claims before the Special Master during the period from January 26, 1948, to March 4, 1948. The Special Master devoted much energy to the solution of the problems and resolved them with great skill. He made detailed findings and an especially able report. The general satisfaction with this report was noted. Practically every one accepted the allowances as set up. The Court was called upon to review the report as to a few items, and in general affirmed with the exception of the allowances to Harry Beckett, Esq., one of the attorneys for the prior preference stockholders' committee. His services were great, but in some respects intangible and uncompensable. The Court, in justice, gave him an increase warranted by the facts. Thereupon, the Court, with some other minor adjustments, approved the report [23] and fixed final over-all allowances in the aggregate of $1,004,945.-67. Thus, the cost was less than 2½% of the value of the debtor's assets, although

21. See opinion dated September 16, 1947, D.C., 97 F.Supp. 899.

22. See opinion dated September 16, 1947, D.C., 97 F.Supp. 903.

23. See opinion dated July 19, 1948, D.C., 97 F.Supp. 918.

this proceeding of immense difficulties lasted longer than ten years and, with the aid of some other factors, is estimated to have contributed $20,000,000 to the estate.

Although the fourteen months required by the plan had expired, there was still a residuum of problems. The state and federal governments claimed income taxes. During the formulation of the plan, the independent trustees had developed the idea of a consolidated income tax return for parent and subsidiaries. This, if adopted, meant considerable savings to the reorganized company. The idea was given informal approval by the agencies involved. However, after the plan had been approved and the period of probation had expired, friction developed, and it appeared that litigation might be involved. But due to forbearance and mutual respect, a compromise was worked out and the problem finally laid at rest.

The independent trustees have therefore arrived at consummation of the reorganization. The struggle from the outset has been to obtain high enough valuation to pay out the bondholders, prior preference and first preferred stock, and specifically, toward the close, has been to obtain a share for the first preferred stock. All the economies, litigation and cooperation with other agencies has been for this end, and each move in this successful proceeding has had its effect. This has been heretofore summarized and we turn now to the factors which related specifically to the problem of survival. The Court has now watched for several months after the solution of all known problems and no cloud has appeared, nor any threatened danger. There is a possibility of continuing too long wardship under the powerful protection of the Court. An operating company of this type, under proper and conscientious management, should be able to stand alone and become a bulwark of our economy.

■ The board, constituted as above stated, has continued to function up to the present date, with the exception of one resignation. The successful operation for many months under this governance assures a good prognosis for the future. The company is thus launched. Dividends have

been paid without the difficulties predicted. The subsidiaries which were shorn away would have militated against successful operation. The capital and dividend structure is sound. A program of rehabilitation and reasonable growth is followed under this leadership. The relations with investing and consuming public and with the supervisory officials, federal and state, are favorable. Under such auspices, the Court releases the utility from tutelage.