WESTERN PAC. R.R. CORP. et al. v.
WESTERN PAC. R. CO. et al.

METZGER et al. v. WESTERN PAC.
R. CO. et al.

No. 12506.

United States Court of Appeals
Ninth Circuit.

Oct. 29, 1951.

Rehearing Denied Jan. 30, 1952.

Dissenting Opinion Feb. 18, 1952.

Petition for Leave to File Motion, etc.,
Denied July 9, 1952.

Supplemental Dissenting Opinion
Sept. 11, 1952.

2. Kent v. U. S., 5 Cir., 157 F.2d 1; Starkie on Evidence, Vol. 1, p. 54; One 1941

Ford ½ Ton Pickup Truck v. U. S., 6 Cir., 140 F.2d 255.

James Alger Fee, District Judge, dissented on original hearing and on denial of petition for rehearing.

Denman, C. J., dissented from decision that losing appellant has no power to petition for a rehearing en banc.

Herman Phleger, Maurice E. Harrison, Moses Lasky, and Brobeck, Phleger & Harrison, all of San Francisco, Cal., Frank C. Nicodemus, Jr., A. Perry Osborn, Norris Darrell and Mahlon Dickerson, all of New York City, Leroy R. Goodrich, Oakland, Cal., for appellant Western Pac. R. R. Corp.

Herman Phleger, Maurice E. Harrison, Moses Lasky, and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for appellant Alexis I. duP. Bayard, Receiver.

William E. Haudek, Julius Levy, New York City, Webster V. Clark and Rogers & Clark, all of San Francisco Cal., Pomerantz, Levy, Schreiber & Haudek, New York City, and David Friedenrich, San Francisco, Cal., for appellants Metzger et al.

Allan P. Matthew, James D. Adams, Robert L. Lipman, Burnham Enersen, Walker Lowry and McCutchen, Thomas, Matthew, Griffiths & Greene, all of San Francisco, Cal., for appellees Western Pac. R. R. Co. et al.

Everett A. Mathews and Pillsbury, Madison & Sutro, all of San Francisco, Cal., A. Donald MacKinnon, Milbank, W. Tweed, Hope & Hadley, Forbes D. Shaw, Whitman, Ransom, Coulson & Goetz, all of New York City, for appellee Western Realty Co.

Before HEALY, Circuit Judge, and FEE and BYRNE, District Judges.

BYRNE, District Judge.

These are appeals from a judgment denying relief to plaintiffs below, who are seeking to recover approximately $17,000,000 from the reorganized The Western Pacific Railroad Company, defendant and appellee.[1] Appellants are The Western Pacific Railroad Corporation (hereinafter sometimes referred to as "Corporation"), its receiver, and three of its preferred stockholders, who intervened to assert Corporation's claims.

Appellant Corporation, from 1916 until the events which gave rise to this litigation, owned all of the capital stock of The Western Pacific Railroad Company, an operating railroad company. The operating company became financially distressed during the "depression of the early thirties" and in 1935 it filed a petition under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The court, in that year, placed its affairs in the hands of trustees. In 1939 the Interstate Commerce Commission approved (233 I. C. C. 409) a proposed plan of reorganization, which was thereafter submitted to and approved by the district court in 1940. In re Western Pac. R. Co., 34 F.Supp. 493. In the plan it was determined, inter alia, that the capital stock of the subsidiary, owned by Corporation, was without equity or value and therefore was not entitled to participate in the plan. Appeals followed and, after a contrary holding by this court, 124 F.2d 136, the Supreme Court considered and rejected the contention of Corporation that it should have the right to participate in the plan because of increased earnings of the debtor while in reorganization, and affirmed the

---

1. There are seven appellees who are an affiliated group. The only one from whom appellants seek a money judgment is The Western Pacific Railroad Company, hereinafter sometimes referred to as the "subsidiary". The term, "subsid- iaries", used in the plural number, refers to The Western Pacific Railroad Company and all other members of the affiliated group of which appellant "Corporation" was the parent.

district court on March 15, 1945.[2] There-after the plan of reorganization was submitted to the creditors in accordance with the statutory requirement, 11 U.S.C.A. § 205, sub. e, and, following their approval, was confirmed on October 11, 1943 by the district court. On April 30, 1944, with the approval of the court, Corporation transferred all of its stock in the subsidiary to the reorganization committee and this stock was later cancelled. On December 31, 1944, the trustees turned the railroad properties over to the reorganized company, The Western Pacific Railroad Company, appellee here.

This litigation involves a dispute about taxes and tax savings for the years 1942, 1943 and the first four months of 1944, a period during which the railroad properties were controlled and operated by the trustees of the bankruptcy court.

During the years in which Corporation was the owner of all the outstanding stock of the pre-reorganization, The Western Pacific Railroad Company, including the years the trustees of the bankruptcy court had possession and control of the railroad properties, Corporation followed the practice of filing consolidated income tax returns in which it reported the earnings of the operating company as well as other affiliated companies.

During the year 1942 the operating company, under the control of the court's trustees, had substantial net earnings. On May 15, 1943, a consolidated return for the calendar year 1942, showing tax liability of $4,201,821.54, was filed by Corporation in behalf of all members of the affiliated group. Corporation, not having had any net earnings during 1942, did not pay any part of the tax.

On July 15, 1944 a consolidated income and excess profits tax return for the calendar year 1943, showing no taxable income, was filed by Corporation in behalf of all members of the affiliated group. The operating company, under the management of the trustees, again made substantial net earnings in 1943, but the loss sustained by Corporation by reason of the declaration of worthlessness of its stock[3] in the operating company (which had cost Corporation $75,000,000) was utilized as an offset in the consolidated return and thus resulted in a net loss and no tax obligation for any of the affiliated group. In addition, part of the loss was "carried back" to 1942[4] and a claim for refund of the taxes paid under the consolidated return for 1942 was filed with the Commissioner by Corporation on March 9, 1945. A consolidated return in behalf of the affiliated group was filed on June 15, 1945, by Corporation for the first four months of 1944. No tax liability was shown by this return by reason of the "carry forward"[5] of an unused portion of the loss arising from the declaration of the worthlessness of the stock of the subsidiary company owned by Corporation.

The validity of the stock loss offsets was questioned by the Commissioner of Internal Revenue, and after negotiations a tax settlement was made with the Commissioner on August 13, 1947 whereby, in consideration of the withdrawal of the claim for refund of 1942 taxes, the Commissioner accepted and approved the returns for the calendar year 1943 and first four months of 1944. Except for the offset of the capital stock loss of Corporation, the net earnings of the subsidiaries for 1943 and the first four months of 1944 would have required the payment of some $17,000,000 in income and excess profits taxes.

This suit in equity was instituted October 10, 1946 by Corporation, alleging "consolidated income tax returns were filed by the plaintiff for itself and its affiliates which reported a deductible loss by the plaintiff in an amount sufficient to eliminate all taxable income for the group as a whole" for the periods in question and praying that the

2. Ecker v. Western Pacific Railroad Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892.

3. Section 123 of the Revenue Act of 1942, 26 U.S.C. § 23(g) (4). By this subsection, losses resulting from worthlessness of stock of an affiliate became operating losses instead of capital losses as theretofore.

4. Section 122(b) (1) of the Internal Revenue Code. 26 U.S.Code.

5. Section 122(b) (2) of the Internal Revenue Code. 26 U.S.Code.

rights and interests of the plaintiff and the defendants be fixed and determined. A complaint in intervention was filed by three stockholders of Corporation on April 7, 1947. The principal difference between the original complaint and the complaint in intervention is the allegations in the latter pertaining to "duality" or interlocking management and "domination" of the parent by the subsidiary. It is alleged that various directors, officers and counsel of Corporation acted as directors, officers and counsel of the subsidiary with the result that the subsidiary dominated and controlled Corporation; that said officers caused Corporation to file consolidated tax returns when Corporation had "no duty or obligation whatsoever so to do". Corporation filed an answer to the complaint in intervention in which it denied "on its own behalf and on behalf of its officers and directors all allegations * * * of domination and control of the plaintiff, its officers and directors" by the subsidiaries and affiliates, *but six months later* Corporation filed a supplemental bill of complaint alleging a "duality of control" and, though falling short of intervenors' allegation of "domination", it alleges "at the special instance and request of the defendants and the trustees in the reorganization proceedings acting for the defendants the plaintiff, however, consented to the filing on its behalf of consolidated * * * tax returns with defendants" for the tax periods in question. It is further alleged that plaintiff "does not aver that in so conducting themselves" the officers acting for both corporations "were aware of wrong-doing or consciously disregarded the interests of plaintiff". There is no assertion of actual fraud or specific acts of deceit nor would the record support any such assertion. Corporation's claim appears to rest on constructive fraud presumed from the intercorporate relationship which it asserts deprived it of its independence and caused it to suffer a loss.

The appellants emphasize that Corporation maintained its offices jointly with those of its subsidiaries and the trustees in New York; that Corporation's officers, who handled the tax transactions, were also employees of the subsidiaries and trustees, and their salaries and the expenses of the office were jointly paid; that because of its impoverished financial condition, Corporation was incapable, as of June 1, 1943, of paying salaries or office expenses and thereafter the subsidiaries paid all of the salaries and office expenses. Appellants refer to this as "duality of management" which they contend created a fiduciary relationship and the subsidiaries' duty to deal fairly with Corporation.

Many of the cases cited by appellants deal with the duties of trustees, agents and partners and with the granting of restitution for violation of their duties. Clarity of reasoning has suffered because of the failure to distinguish between the several varieties of fiduciaries, and the duties imposed on each. Although all trustees are fiduciaries, all fiduciaries are not necessarily trustees.

"A person in a fiduciary relation to another is under a duty to act for the benefit of the other *as to matters within the scope of the relation*. Fiduciary relations include among others the relation of trustee and beneficiary, guardian and ward, agent and principal, attorney and client * * *. The directors and officers of a corporation are also fiduciaries, as are receivers, and executors and administrators. *The scope of the transactions affected by the relation and the extent of the duties imposed are not identical in all fiduciary relations * * *.*" Restatement of Restitution, Section 190, comment "a". (emphasis added.)

As stated by Professor Scott in 49 Harvard Law Review at page 521: *"In some relations the fiduciary element is more intense than in others; it is peculiarly intense in the case of a trust * * *."* (emphasis added.)

Appellants place a great measure of reliance on the case of Commercial National Bank in Shreveport v. Parsons, 5 Cir., 144 F.2d 231, 236. That case is distinguishable from the case before us in that the fiduciary relationship arose out of a contract which imposed the *duties of a trustee* upon the "new bank". The court decided the case on the established rule that a *trustee* owes the duty of absolute fidelity to the *trust estate* and may not profit by dealing with it. We

know of no better way to point up the distinction than to use the words of the court cited and emphasized by appellant's brief: "The credit thus obtained by the new bank was a profit derived from the *trust property* as effectively as if it had been paid that much in cash." (emphasis added.)

Cases which deal with trustees, agents and partners are not controlling here as there is no contention that the subsidiary was a trustee, agent or partner. It is appellants' contention that the subsidiary dominated Corporation through the dual officers. If this be true, then a fiduciary relationship existed, but the duties imposed were not those of a trustee. While a trustee *may not deal* with the trust estate and thereby make a profit, affiliated corporations are usually associated for the very purpose of dealing with each other for profit, e. g., manufacturing and sales companies; railroads and their subsidiary short line companies. Even the corporation which dominates its subsidiary, with the resultant fiduciary relationship, properly deals with its affiliate for profit *as long as there is no overreaching or unfairness.*

Whether or not a fiduciary relationship exists, and the extent of the duties imposed, depends upon the particular field of substantive law involved. We must look to the law of corporations to determine whether the subsidiary stood in a fiduciary relation to Corporation. The mere fact of officers and directors in common does not create such a fiduciary relationship. There is nothing insidious about duality of management and control as such. It is very common in the realm of business, particularly in the situation of parent and subsidiary, as here. At times business convenience requires such relationship. The *officers and directors* who occupy this dual position are fiduciaries to both companies and owe a duty of loyalty to each. Thus they cannot favor the interests of one corporation while sacrificing or betraying those of the other. If they do so, they must respond in damages for their tortious conduct or account

for any benefits derived through their breach of duty.

But rules relating to the individual officers do not reach the point involved in this case. Here we must determine whether *the subsidiary corporation* stood in a fiduciary relation to *the parent corporation.* There are several orthodox ways in which one corporation may become a fiduciary in relation to another corporation, e. g., it may hold property in trust for the other, or it may become an agent for the other. Fiduciary duties also arise where one corporation dominates the other. Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. Although the presence of common officers and directors does not in itself create a domination or a fiduciary relationship between the corporations, it does subject dealings between them to judicial scrutiny as to their fairness and reasonableness to ascertain if domination exists, and if so, whether it has resulted in overreaching which will raise a presumption of constructive fraud.

There obviously existed an interlocking management between Corporation and the subsidiaries. But this situation was not of the subsidiary's making. On the contrary, it was created by Corporation, whose stockholders elected its Board of Directors, who appointed its officers. Since plaintiff Corporation owned 100% of the stock of the subsidiary, it elected all of the directors of the subsidiary, which, in turn, appointed its officers. After the subsidiary was reorganized it was no longer controlled by Corporation but by the trustees appointed by the bankruptcy court.[6] Corporation continued in office the same directors who, in turn, continued to employ the same officers. This was not unnatural since Corporation continued to own all the capital stock of the subsidiary long after it had been divested of control of the subsidiary by reason of the reorganization.

If it be assumed that the advent of the trustees into the affiliation and the increased prosperity of the subsidiary result-

6. The name of one of the trustees was submitted to the court by Corporation and the other was selected by the court and approved by all interested parties in the bankruptcy proceeding.

ed in control of the affairs of Corporation so as to raise fiduciary obligations, the scope and extent of the subsidiary's obligations would be to deal fairly with Corporation. A corporation can only act through its officers and agents. It follows that if there was domination and unfairness it was exercised through the dual officers who forsook their obligations to Corporation, by which they were appointed, and served the purposes of the subsidiary. Although the arguments of appellants are exceedingly general, it is apparent that they assign three particulars wherein the dual officers failed in their obligations to Corporation, resulting in unfairness: (1) They filed consolidated returns; (2) they failed to exact an agreement from the subsidiary requiring payment of money to Corporation as a condition to their consent to file consolidated returns; (3) they should have resigned and allowed the appointment of successors who would have exacted such an agreement from the subsidiary. We shall discuss these three particulars seriatim.

The consolidated returns were filed by Corporation as the parent, for itself and its subsidiaries. Appellants contend that the subsidiaries caused [7] Corporation to file consolidated returns when it had "no duty or obligation whatsoever so to do". The filing of these returns was in exact conformity with the practice followed since 1916. Beginning in 1927 Michael J. Curry, first as treasurer and after February 1, 1942 as president of Corporation, supervised preparation of consolidated returns, signed and filed them. In each year the consolidated tax liability was distributed pro rata to those members of the group who had taxable incomes without allocating any tax to a company showing a loss or paying such company tribute for the tax "saved" by the use of its loss in the returns. Mr. Curry supervised preparation of a tentative tax return for 1942, and on March 15, 1943, signed and filed it and ar-

ranged for an extension of time until May 15, 1943, to file the final return. On March 23, 1943, F. C. Nicodemus, Jr., who was counsel for Corporation at the time and *appears on the pleadings and briefs in this case as present counsel for appellants,* suggested by letter [8] to Mr. Schumacher, one of the trustees of the operating company, that he be authorized to employ Messrs. Whitman, Ransom, Coulson & Goetz, tax experts, to advise him on tax matters. This was done. Mr. Polk of this firm continued to advise with the officers of the group through the periods here in question. Mr. Polk reviewed the tax situation with Mr. Curry and Mr. Nicodemus and on May 20, 1943, prepared a detailed written report [9] addressed to Mr. Curry and circulated to Mr. Schumacher and Mr. Nicodemus. The report reviewed the tax advantages of consolidated returns and suggested the possibility that, under the recently enacted amendment to Section 23 (g) of the Internal Revenue Code, the loss of Corporation, upon a determination that its stock in the subsidiary was worthless, might constitute under a consolidated return, an offset to income of other group members. A consolidated return reporting the loss of Corporation as an offset to group income was prepared in the joint New York office, signed by Mr. Curry, and filed by him on July 15, 1944. The return reported no tax owing. Substantially the same procedure was followed for the "carry back" claim for refund March 9, 1945, as well as the consolidated tax return for the first four months of 1944, which was filed July 15, 1945.

It hardly seems conceivable that Corporation could complain because consolidated returns were filed. Not only was it in accordance with past practice of the group and under the supervision of Corporation's president, as in former years, but it was done under the guidance of the independent tax experts employed upon the suggestion of the General Counsel for Cor-

7. Appellant Intervenors attribute the "causation" to "domination and control" of Corporation by the subsidiaries and trustees, whereas Corporation, which denies "domination and control" merely attributes it to its consent to the filing "at the special instance and request of the defendants and the trustees * * *" (pleadings).

8. Pl.Ex. 39B (read into record, page 544).

9. Pl.Ex. 50.

poration, who *represents appellants in* the present proceeding. As the trial court stated [10] "* * * when everybody was, as they were in this case, acting completely in the open in the matter, nobody was concealing anything from anyone else, the element of fraud or deception, of the kind that you refer to, is absent * * *. Everybody knew that consolidated returns were being filed * * *. Everybody knew that these attorneys were being employed to file this consolidated return. It was all done right out in the open." At the time of trial plaintiff intervenors appeared to agree with these observations of the trial court,[11] but on this appeal they infer that there was something sinister about the filing of the consolidated returns.

It is interesting to note the reactions of appellants to observations in the opinion of the trial court [12] to the effect that the Commissioner erred in allowing the tax deduction in question. They vehemently argue that the filing of the consolidated returns and the use of plaintiff's loss to offset defendant's income was proper under the tax law and regulations. It is also interesting to note that the compromise of the tax claim between the Bureau of Internal Revenue and Corporation acting through its attorney-in-fact, James K. Polk, occurred *after* this action was commenced on October 10, 1946, and *after* the filing of the complaint in intervention on April 7, 1947; that no effort was made to invoke the power of the court to enjoin the officers of Corporation from continuing in their efforts to have the Bureau accept the consolidated returns as filed; that nothing was done to revoke Polk's power-of-attorney to represent Corporation in the proceedings before the Bureau; that Polk, as attorney-in-fact for Corporation, made an offer of settlement of tax liability for 1942, 1943 and the first four months of 1944 by letter of May 19, 1947, to the Internal Revenue Bureau; that a stipulation (hereafter discussed) was entered into between counsel in this case approving the settlement of the returns with the Government; that Corporation's Board of Directors adopted a resolution approving and ratifying the offer of settlement August 13, 1947.

■ The conclusion is inescapable that Corporation's officers, when they filed consolidated returns, did not violate any obligation but, on the contrary, were conforming with the policy and directions of Corporation.

Appellants suggest that Corporation was under no obligation to file consolidated returns; that it could have demanded that the subsidiaries enter into an agreement

---

10. Page 970, Transcript.

11. Page 971, Transcript: "The Court: Well, all I have to say to you there, Mr. Levy, is that I don't think it is necessary to carry that argument forward now. Everybody knew, didn't they, that the consolidated return was being filed? So that the defendant railroad company wouldn't have to pay any income tax? That was why it was filed, wasn't it?

"Mr. Levy: Yes, your honor."

12. In the opinion filed by the trial court, D.C., 85 F.Supp. 868, 874, appears the expressed view that the Bureau of Internal Revenue should not have compromised the tax claim of the taxpayers and should have insisted that the claimed deductions be disallowed in their entirety. The court said, "If I had the power, I would not hesitate to set aside the tax settlement. Indeed, if I could, I would order these taxes paid to the United States. That would effectively dispose of the cause." While we agree with the principal holding of the trial court, we do not share this view. A taxpayer may avail himself of every means of tax deduction proper under the applicable statutes. Here the Commissioner questioned the taxpayer's right to the deduction and, after months of negotiation, compromised the disagreement with the taxpayer in lieu of litigating it in the Tax Court. The tax laws authorize the Commissioner to enter into compromises and they are binding on the court in the absence of fraud. This is particularly true in a collateral proceeding. The settlement of the tax claims is an undisputed fact in this case and whether or not it was advantageous to the government is not in issue. The trial court recognized the expression of this view as dictum when it stated: "Obviously the Court cannot pass judgment upon the validity of the tax compromise and settlement. It is now closed. It is final and cannot be reopened except for fraud." (emphasis added.)

to pay it a sum of money as a prerequisite to its consent to filing such returns; that inasmuch as its officers did not exact such an agreement, they failed in their obligation to Corporation and are chargeable with an "unfair" omission to be imputed to the subsidiary by reason of the supposed domination.

■ Section 141(a) of the Internal Revenue Code grants the privilege of filing consolidated returns upon the condition that all members of the affiliated group consent to the regulations prescribed by the Commissioner under the authority of subsection (b) of the same section. Regulation 104, Section 23.12 provides that the consolidated return shall be made by the parent corporation. Under the Regulations, the parent corporation is the agent for the entire group, and (except in unusual circumstances) all dealings with the Commissioner are handled by the parent.

Appellants argue that consolidated returns were designed solely for the benefit of the parent corporation. The argument is not sound. The Code and Regulations recognize that the benefit of consolidated returns is for all corporations in the group. Any subsidiary in the group, as well as the parent, may prevent the filing of consolidated returns if the filing is detrimental or contrary to the interests of such corporation. Appellants assert that in the usual case the tax saving which a subsidiary effects will inure to the parent by way of increasing the value of its stock or by way of dividends. This is quite true in the usual case. But it does not mean that this result must follow, nor does it follow that, because the value of a parent's equity in a subsidiary corporation is increased by reason of benefits flowing to the subsidiary's preferred stockholders and creditors, it may receive the benefits direct, regardless of the rights of the subsidiary's preferred stockholders, creditors and minority common stockholders.

■ The appellants and intervenors contend that the tax laws require "economic unity" for the filing of consolidated returns. This is incorrect. The Regulations suggest procedure in cases where a subsidiary has left the affiliated group. Regulation 104, Section 23.12(e). Thus, the regulations specifically envision situations where economic unity shall cease and yet permit the filing of consolidated returns. If, by the time the returns are filed the affiliation has ceased to exist, any benefits to the subsidiary obviously cannot inure to the parent. That is precisely the situation in the case at bar. In the tax periods involved there was an affiliated group. When the returns and the claim for refund were filed, affiliation no longer existed. Therefore, the benefit of the consolidated return could not accrue to the parent corporation. If the assertion of appellants that consolidated returns "are not permitted for the benefit of the subsidiaries" were literally true, then there would be no lawsuit here because consolidated returns could not have been filed in the first instance.

■ Appellants cite three decisions of the Securities and Exchange Commission in support of their view that the rationale of the tax laws requires that any benefits resulting from the tax laws should go to the parent.[13] These decisions do not support this contention of appellants. These companies were seeking the approval of the Commission to alteration of inter-company agreements respecting income taxes. All three decisions show a decided viewpoint that the tax savings from consolidated returns *shall not* be paid over to the parent if this would in any way endanger the position of the creditors of the subsidiary. They also make clear that a company whose loss was utilized for the benefit of the group does not have a right to compensation from those who benefited. In the Cities Service case, supra, the Commission said: " * * * we think it should be observed that in the ordinary case the fact that one subsidiary contributes a particular income deduction to a

---

13. In the Matter of Consolidated Electric & Gas Co., 15 S.E.C. 161; In the Matter of Consolidated Electric and Gas Co. and The Islands Gas and Electric Co.,

13 S.E.C. 649; In the Matter of Cities Service Company and Cities Service Refining Corporation, Holding Co. Act of 1935, Release #5535, File 70–988.

consolidated return *does not in itself entitle that subsidiary to the benefits of the reduced taxes* resulting from the deduction. Where the reductions are possible from filing a consolidated return, they ordinarily are due to a number of factors contributed by the various members of the consolidated group, including, among others, earnings, and excess profits tax credits, as well as income deductions." (emphasis added.)

There is nothing in the Code or Regulations that compels the conclusion that a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving.

Assuming, as we have, that the subsidiary dominated Corporation through control of the dual officers, it did not abuse its supposed dominant position because the officers and directors common to both corporations did not sacrifice Corporation's interests to those of the subsidiary. When the Supreme Court decided that Corporation could not participate in the increased earnings of the operating company while in reorganization, Corporation suffered a severe loss. Since it had no income, there was no possible way for it to achieve any tax advantage to offset the loss. But its affiliate did have use for the loss and the group was entitled, under the tax law, to make use of that means of tax savings. The dual officers owed fiduciary duties to both corporations to promote the interests of both and to obtain for each what it was entitled to under the tax laws. Under this state of facts these officers had a positive duty to make use of the loss as they did, that is, to offset the income of members of the affiliated group with deductible losses of other members. If the positions of the corporations were reversed and the subsidiary had a loss and the parent had income, the officers would have been obliged to file consolidated returns to enable Corporation to make use of the loss. Indeed, this very thing had occurred in previous years of the affiliation and Corporation had effected substantial tax savings (Def. Ex. 46) by reason of filing consolidated returns. The record is clear that on none of these occasions was tribute paid to a subsidiary which had suffered a loss. The officers would have been derelict in their duty to the subsidiary had they failed to file consolidated returns. Their duty to Corporation required only that they not sacrifice its interests and did not require them to exact tribute for following the practice of the past twenty-five years. After the transaction Corporation was in exactly the same position that it was in before the subsidiary had effected the tax saving allowed by the tax laws.

■ However, it is contended that the subsidiary should have notified the Corporation's stockholders and directors of the filing of consolidated returns so that independent directors and officers could have been put in charge of Corporation's interests to make a bargain with the subsidiaries and obtain compensation as a prerequisite to filing consolidated returns. There are several things wrong with this argument. The most obvious is that the entire transaction was open and above board. Many persons having an interest in Corporation, including stockholders and counsel, were fully aware of the situation. They chose not to act. They apparently preferred to permit the transaction to stand, intending thereafter to bargain for a share in the tax savings. They made no effort to inject themselves into the tax settlement with the government. But all this assumes that it would have been proper for Corporation to have made such a bargain. The Corporation was the sole owner of the subsidiary's capital stock. As such it was under a duty to deal fairly with the subsidiary having full regard for the interests of the creditors and holders of other securities. Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 522, 61 S.Ct. 675, 85 L.Ed. 982. It owed a duty not to require its subsidiary to forego a legitimate tax saving and could not bargain to perform its duty. A parent company is not acting in the best interests of its subsidiary when it seeks to appropriate to itself an advantage which the tax laws give the subsidiary.

■ Plaintiff argues that it was a "complete stranger" to defendant when the consolidated return was filed July 15,

1944, because the affiliation terminated on April 30, 1944, when its stockholdings were transferred to the reorganization committee. A tax return is an historical document relating to the past. This return related to a period when the affiliation existed. All fiduciary duties with respect to matters arising during the relationship continue during the winding up period, and are "as sacred and inviolable after as before the expiration of its term".[14] It would be ridiculous to say that a fiduciary who performs an act winding up matters which relate to the affiliation period may exact payment merely because the relationship has technically terminated. If Corporation had required tribute as a condition of its cooperation, then it would have been acting with less than the required standard of fairness to the subsidiary's creditors. Equity will not permit a recovery as a substitute for a bargain which would have been unfair.

■ The record is barren of evidence to support the contention that Corporation was dominated by the subsidiary, or that there was a breach of any duty owed to Corporation. As the trial court stated, "The so-called 'duality of control,' much discussed and emphasized, is not important". [85 F.Supp. 875.]

Appellants contend that they have a special claim to the 1942 tax saving. They rely upon a pretrial stipulation and order. The proposed settlement of tax liability with the government provided that the returns for 1942, 1943 and first four months of 1944 were to be approved as filed, and that the claim for refund of 1942 taxes was to be rejected. Intervenors applied to the court below for an order restraining the consummation of the settlement on the theory that the rejection of the 1942 refund claim might be prejudicial to the position of Corporation in this litigation. The parties entered into a stipulation providing that *for purposes of litiga-* *tion* the 1942 refund claim, diminished in proportion to the diminution of the entire tax saving, should be deemed to have been allowed and "paid to the plaintiff *as the agent for the affiliated group * * *.*" (emphasis added.) The pretrial order confirmed the stipulation.

■ The trial court did not make formal findings of fact and conclusions of law, but relied upon section 52(a), F.R. C.P., 28 U.S.C., which provides in part: "* * * If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. * * *" Findings of fact and conclusions of law are intended to aid appellate courts by affording them a clear understanding of the basis of the decision below. Findings are not a jurisdictional requirement of appeal which this court may not waive. Even in cases where there are no findings, if the record is so clear that the court does not need them, it may waive the defect on the ground that the error is not substantial in the particular case.[15]

In the instant case the trial court's opinion discloses adequately the issues of fact which were before the court and the court's findings thereon.

■ The trial court, in a note appended to its opinion, stated that "Inasmuch as there is little factual dispute" the opinion would serve as findings of fact and conclusions of law, but "counsel, if they wish, may submit findings * * *." All parties elected not to submit additional or more detailed findings except that the appellants proposed findings with respect to the above stipulation and pretrial order, and also a conclusion of law to the effect that the defendant should pay to the plaintiff the sum of $3,385,290. These proposed findings and conclusions, which were inconsistent with those embodied in the opinion, were rejected by the trial court.

14. Trice v. Comstock, 8 Cir., 1903, 121 F. 620, 625, 61 L.R.A. 176; Uniform Partnership Act, 7 U.L.A. Sec. 30; Cal.Corp. Code Sec. 15030; 3 Scott on Trusts (1939) Sec. 344; 16 Fletcher, Corporation (Perm.Ed.) Sec. 8174.

15. Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 60 S.Ct. 517, 84 L.Ed. 774; Hurwitz v. Hurwitz, 78 U.S.App.D. C. 66, 136 F.2d 796, 148 A.L.R. 226; Goodacre v. Panagopoulos, 72 App.D.C. 25, 110 F.2d 716.

Appellants argue that the court below concluded that it should leave the parties where it found them and that Corporation is therefore entitled to the assumed avails of the reduced refund claim.

The stipulation and pretrial order were entered into and made for the purpose of protecting the position of Corporation in relation to the refund claims *only* if it should be found entitled to the refund. *The court found it was not entitled to it.* Appellants' position is no stronger with respect to the refund for 1942 taxes paid by the subsidiaries than it is with respect to the 1943 and 1944 savings of the subsidiaries. It is true that the government requires consolidated returns be filed in the name of the parent and that refunds are paid to the parent, but where such refunds are paid, the parent holds the refund as agent or trustee for the benefit of the affiliate which has overpaid.[16]

 In their brief appellant-intervenors allude to the losses they sustained as stockholders and imply that they have an equitable right to compensation apart from that of Corporation. To believe this would be to misapprehend their position. A corporation is a legal entity separate and distinct from its stockholders and benefits to the latter flow from the rights of the corporation. If this were not true these intervenors could not hope to gain by this proceeding as *they* sustained no loss by reason of Corporation being barred from participation in the reorganization plan. Their pleadings, as well as a stipulation filed in this suit, show that they acquired their stock after Corporation's stock in the subsidiary had been declared worthless. Defendants offered to prove at the trial that intervenors purchased their stock for less than one cent on the dollar. The offered evidence was properly excluded as irrelevant by the trial court. The fact, if it be a fact, that any or all of the present stockholders of Corporation acquired their

stock as a speculation while the corporation was in the process of liquidation and its "stock was of trifling value" (page 11, intervenors' opening brief), is irrelevant to the issues here. Corporation is an entity and the issue is whether or not it is entitled to recover $17,000,000 from the successor of its former subsidiary. If it prevails its stockholders are entitled to reap the benefit, regardless of when they became such, or how "trifling" a sum they paid for their stock. The intervenors recognized this when they filed their complaint in intervention to *assert Corporation's claims*.

We have examined the other authorities cited by appellants and find nothing contrary to our holding here. Appellants cite Southern Pacific Company v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 63 L.Ed. 1099. That case was not concerned with the question of fiduciary relationship between parent and subsidiary. Rather, it was concerned with the fiduciary duty owed by the holders of the majority of the stock of a corporation to the minority stockholders. The case holds that a parent company has a fiduciary duty to any minority stockholders of the subsidiary.

Also cited is North American Co. v. S. E. C., 327 U.S. 686, 693, 66 S.Ct. 785, 90 L.Ed. 945. That case is not in point either. The court was not concerned with any question of fiduciary relationships. Rather it was concerned with the validity of the so-called "utility holding company death sentence" provision of the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq.

The judgment is affirmed.

JAMES ALGER FEE, District Judge (dissenting).

There are no findings of fact which support the judgment of the Trial Court or the affirmance thereof by a majority of this Court.[1] The cause should be remanded for

16. Bankers Trust Co. v. Florida East Coast, etc., 5 Cir., 92 F.2d 450.

1. The patent insufficiency of the findings of the lower court to support the weight of the superstructure now imposed is apparent. The order adopted the opinion as findings: "Findings of Fact. Plaintiff having proposed findings of fact in addition to the findings contained in the Court's opinion filed herein on September 6, 1949, and the defendant having objected thereto, and the Court being now satis-

this reason alone.[2] The Trial Court gives two reasons for decision against plaintiff: first, that the "tax escape" was a fraud on the government, and, second, that a recovery would violate the reorganization decree. Neither has any validity.

The major portion of the opinion of the Trial Court is devoted to the proposition that the "tax escape" was a fraud upon the government,[3] and therefore the proceeds were given to the defendant, an active wrongdoer.[4] This position that there was a fraud is given no support by the tax agents of the government who made the settlement.[5] It was expressly repudiated in open court by every party in this case. The majority of this Court, as the opinion shows, does not rely upon it.

A second subsidiary theory was also advanced below with little emphasis. The Trial Court said it would be inequitable to allow recovery to plaintiff because the stock of the then subsidiary owned by plaintiff was denied participation in either the assets or earnings in the reorganization proceeding. This reason is as unstable as the first.[6] The claim of plaintiff was not one against the original company,

fied that all facts necessary for decision are found in the opinion of September 6, 1949, now adopts by reference all such findings as its formal findings of fact in this cause, for all purposes as if the same were fully set forth herein. Conclusions of law. The Court concludes that the plaintiff shall take nothing herein and that the defendants shall have judgment in their favor for their costs of suit."

Rule 52, Federal Rules of Civil Procedure; 28 U.S.C.A. § 2106; Interstate Circuit v. United States, 304 U.S. 55, 56, 58 S.Ct. 768, 82 L.Ed. 1146; Kelley v. Everglades District, 319 U.S. 415, 420, 421, 63 S.Ct. 1141, 87 L.Ed. 1485.

2. The opinion of September 6, 1949, thus referred to, appears in D.C., 85 F.Supp. 868. Insufficiency of findings appears in important particulars indicated below.

There are no findings as to the mechanics of use of the right of plaintiff. It is not shown whether any resolutions were passed by the Board of Directors or stockholders of plaintiff authorizing the use for benefit of defendant. There is no finding whether a gift of the right was intended or whether there was an attempted payment of consideration.

There is no finding that plaintiff was ever a party to the reorganization proceeding. There is no finding that plaintiff had any connection with the proceeding except to prosecute a claim for value of stock, which was disallowed.

There is no finding that the compromise settlement with the government, in which plaintiff participated and from which benefit to defendant arose, was connected with or contemporaneous with the reorganization proceeding.

The court should have found that defendant honestly believed that it was rightfully entitled to use the loss of plaintiff without consulting those beneficially interested in plaintiff or it used the loss fraudulently in deliberate disregard of the rights of those beneficially interested in plaintiff. The court should have found whether defendant was guilty either of mistake or of fraud. The belief of defendant's officers as to its rights at the time of filing the consolidated returns is one of the key facts in the case and should have been the subject of findings.

3. The rationale of the opinion is set forth in colorful language. D.C., 85 F.Supp. 868, 875: "An array of able counsel on both sides have put forth prodigious and ingenious efforts, one side to retain the benefits of the tax 'escape,' and the other to obtain them. And all the time the taxes escaped in reality belong to the United States!

"The Court cannot cause these taxes to be paid, where they should be paid, to the United States."

4. Even if the transaction were illegal, the result reached by the Trial Court could not stand. Cf. Barney v. Saunders, 16 How. 535, 57 U.S. 535, 543, 14 L.Ed. 1047: "They cannot be allowed to aver that the profits made on the trust funds should be put in their own pockets, because they were unlawful gains, for fear that the conscience of the cestui que trust should be defiled by participation in them. To indulge trustees in such an obliquity of conscience, would be holding out immunity for misconduct and an inducement to speculate with the trust funds, and put them in peril."

5. The fact that the agents of the government, who effected the settlement, did not agree that there was a fraud on the United States is shown by United States ex rel. Roberts v. Western Pacific Railroad, 9 Cir., 1951, 190 F.2d 243.

6. The error of the lower court was in assuming that plaintiff is seeking an interest in the defendant corporation instead of compensaton for property taken by defendant which belonged to plaintiff. The

which was placed in reorganization. Everyone admits the genesis of the loss of plaintiff occurred later. Therefore, the claim would not in any event be barred by the decree of reorganization.[7] The liability to the government for taxes was not barred by that decree either. Liability for the use of plaintiff's loss long after the closure of the reorganization proceeding to obtain a benefit for defendant by compromise of the still existing tax claim could not be discharged nor affected by the decree in reorganization. The right furnished consideration for contractual liability between plaintiff and defendant as independent corporations. Plaintiff had a property right as owner of these shares of stock.[8] The reorganization court had power to deny plaintiff participation in the assets of its subsidiary, and, as a result, all but nominal values in the shares in the subsidiary were lost. But plaintiff was not in reorganization itself.[9] The company in reorganization did not own the stock and could not legally exercise the appurtenant property right to file a consolidated return. The reorganization court had no jurisdiction of plaintiff or of these property rights.

Decree of that court attempting to destroy rights of property in the stock owned by plaintiff would be void. The reorganization decree does not deal with the property rights in the stock and is therefore res judicata neither as to plaintiff nor as to its rights of property in the shares of stock or appurtenances.

Thus the two grounds advanced to sustain the judgment fail. The cause should be reversed for failure to state adequate findings to support the judgment. Findings must be made in the Trial Court. Appellate courts have no such right or function. The majority opinion attempts to accomplish justification of the result below by drawing inferences, deductions and conclusions from evidence which they claim to find in the record. It would be possible for other judges to set up a diametrically opposite set of facts from which a judgment in favor of plaintiff might be based. The very reason that Rule 52 requires findings of fact is illustrated by the majority opinion. For the technical difficulties of finding a basis of fact for this judgment are many. Indeed, such difficulties are insurmountable.

If recovery is to be denied, the findings of fact, upon which determination adverse to plaintiff is based, must deal with the admitted facts and the allegations of the complaints of intervenors and plaintiff. Thereby, these material claims must be negatived.

In order to indicate what findings must be made to negative plaintiff's claim, a review of various phases thereof will be made. First, plaintiff had a property right

---

Trial Court made no finding as to the nature of the right to file consolidated returns, which only plaintiff could exercise (Reg. 104, § 23.16(a) ), but which it could refuse to exercise (Reg. 104, § 23.11(a) ). Until such findings are made, there is no basis for a judgment denying participation in benefit.

7. The effect of the decree is provided by 11 U.S.C.A. § 205 sub. f, Tilt v. Kelsey, 207 U.S. 43, 52, 28 S.Ct. 1, 52 L.Ed. 95. Since the tax settlement between the government and the corporation occurred after the decree in reorganization, there could be no res judicata. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597 et seq., 68 S.Ct. 715, 92 L.Ed. 898; Diaz v. United States, 223 U.S. 442, 449, 32 S.Ct. 250, 56 L.Ed. 500.

8. An incontrovertible proof of the proposition that plaintiff had no duty to apply the loss for the benefit of defendant may be cited. If plaintiff had sold a gold mine for a profit of over $75,000,000.00, its loss on the stock of the subsidiary could have been applied to offset any taxes against plaintiff. In that event, the trustees in reorganization would have been required to pay taxes against the operating company. Once used, the power of applying the loss would be functus officio, and plaintiff would have received the entire benefit.

9. Callaway v. Benton, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553. The error in this proceeding, therefore, was the failure to reorganize plaintiff also. An illustrative case, where the parent was in reorganization, is reported in a series of opinions as In re Portland Electric Power Co., D.C., 97 F.Supp. 857–921. There a consolidated return was filed during the proceedings and the benefits appropriately distributed.

to file or refuse to file consolidated returns, which could neither be given away without consideration nor cut off judicially without due process. Second, a trust fund was apparently created to pay these taxes by the reorganization court, and no order thereof has been shown vesting this fund in defendant. Third, by stipulation with defendant, plaintiff, as trustee, deposited a trust fund in court, which has not been distributed. Fourth, as an independent corporation, plaintiff, at request of defendant, filed consolidated returns and made a settlement with the United States, from which defendant derived benefit. Therefore, plaintiff is entitled to recovery for at least as much as it was worth. Fifth, a recovery much in excess of bare compensation for doing the acts is foreshadowed. Plaintiff has not been found to be in a fiduciary capacity toward defendant, and therefore the actual cash benefit obtained by defendant by use of losses of plaintiff might well be compensated by award of an equitable portion of the tax remission which the United States allowed on account thereof. The findings made do not negative these contentions.

First then, plaintiff was found by the Trial Court to have been the owner of all the stock in the operating company when the petition for reorganization was filed. The Interstate Commerce Commission held that the assets of the operating company, at the initiation of the proceeding, were so shrunken that this stock was valueless for the purpose of participation in either the assets or earnings of the reorganization. The Supreme Court affirmed the denial of the petition of plaintiff for this relief. Plaintiff thereby is found to have sustained a loss of $75,000,000.00 There is no finding that the property right in the shares of stock was taken away from plaintiff either by this order or by the decree of reorganization.[10] Because of this ownership of these shares, plaintiff claims, under the recent enactment of Congress, a property right appurtenant thereto to use this loss in consolidated return and to offset it against earnings made by the properties in reorganization. Since, under the law, all corporations concerned must consent to the filing of consolidated returns, it is clear, contrary to the statement in the majority opinion, that plaintiff had no duty requiring it to file these returns. Plaintiff had a legal right to refuse to file. There is neither finding of fact that this property right did not accrue to plaintiff nor a finding that the right vested in the subsidiary, the trustees in reorganization or in defendant.

It is found that plaintiff, by contract, transferred the stock in the former subsidiary to the reorganization trustees, after the right to file consolidated returns and have the benefit of offsetting losses against operating gains by the trustees, for income tax purposes, had accrued. These shares are thus recognized as property rights. There is no finding that the right to file or refrain from filing consolidated returns was sold and transferred with the shares of stock to the reorganization trustees.

And here it might be well to deal with one specious argument. It seems to be assumed that the officers of plaintiff could give away the property right to file or refuse to file consolidated returns either voluntarily or acting under the control of defendant or the reorganization trustees. This is strange doctrine. At the time of the transfer of stock, rights of creditors of plaintiff as well as those of stockholders were involved. By the enactment of Elizabeth, an insolvent corporation cannot hinder, delay or defraud its creditors by a transfer of property in their despite.[11] The equitable considerations are stressed by the Trial Court. The Chancellors have universally held that a transfer of all the assets of corporation, at the time not insolvent, cannot be made even by a ma-

---

10. It is inconceivable that a decree of reorganization prevents the company, when released from tutelage, from entering engagements and incurring liabilities. Otherwise, the reorganization would be perpetual. See In re Portland Electric Power Co., D.C., 97 F.Supp. 857, 873.

11. Act of 1571, 13 Eliz. c. 5; 1 Glenn, Fraudulent Conveyances and Preferences (Rev.Ed.,1940.) §§ 61d, e.

jority of the stock.[12] Neither officers nor directors, without a vote of the majority, have such power.[13] In this case, it is of stellar importance that this right of plaintiff was its sole asset and that, upon appropriation thereof, it became insolvent.[14] Specifically in any event, the transfer must be for adequate consideration and not in fraud of creditors or it will be invalid as against stockholders.[15] There are thus equitable considerations which the findings did not exclude.[16]

In a suit where stockholders of plaintiff intervene, there must be findings that there was adequate consideration for the shares of stock and the appurtenant right of filing a return. Otherwise, the District Court would be obliged to set aside the reorganization decree in order to grant relief by recapturing the assets of plaintiff improvidently given away.[17]

But a jury argument is made based upon a bare offer, which the Trial Court properly held incompetent, that the present stockholders of plaintiff did not pay adequate value for the stock. Suffice it to say that the James interests, which are present stockholders of defendant and which will share in this windfall, apparently acquired that stock to some extent by compromise of the interests of plaintiff in the stock which it formerly held.

Second, plaintiff claims there was a trust fund created by the reorganization court in the amount of $7,100,000.00 for the payment of taxes, and that defendant added $3,000,000.00 to the fund for the same purpose. Plaintiff claims, since these funds were saved by its action in filing the consolidated returns and making a contract of settlement with the government, that it is entitled to receive some compensation for conserving the trust funds. This claim is not valid as to the fund initiated by defendant itself. A corporation has a right to set up reserves from its funds to meet contingencies. But the money impounded by the Bankruptcy Court to pay taxes was made up of funds in the hands of the reorganization trustees. There must be a finding that the Court decreed that this money should become the property of the defendant if not used to pay taxes. Otherwise, it constitutes a trust fund of undistributed assets of the reorganization.[18]

Third, plaintiff claims defendant stipulated that the $3,385,290.00 should be treated as if it had been paid to plaintiff "as agent" and the latter had placed this trust fund in court for distribution.[19] By the

12. Des Moines Life & Annuity Co. v. Midland Insurance Co., D.C., 6 F.2d 228. The statutes carry out the principle with various limitations. As plaintiff is a Delaware corporation, see Del.Rev.Code, 1935, c. 65, § 2097.

13. Fletcher, Cyclopedia of the Law of Private Corporations (Perm.Ed.) § 1107.

14. The trust fund theory probably applies. See Fletcher, Cyclopedia of the Law of Private Corporations (Perm. Ed.) § 7371.

15. Fletcher, Cyclopedia of the Law of Private Corporations (Perm.Ed.) § 2946, notes 99 and 1.

16. An interesting case in this Court, where the subsidiary was held liable for the unauthorized transfer of property of the parent by an officer of the subsidiary, is Clark & Wilson Lumber Company v. McAllister, 9 Cir., 101 F.2d 709.

17. Since plaintiff is a Delaware corporation, the decisions of that state are cited as illustrative of the general principle. Robinson v. Pittsburgh Oil Refining Corporation, 14 Del.Ch. 193, 199, 126 A. 46;

Hutton v. West Cork Railway Company, 23 L.R. Chancery Div. (1883) 654, 671, 677; Revised Code of Delaware, 1935, Ch. 65, § 2097; Ch. 174, § 6059 et seq. Cf. Laws of Delaware 1941, Ch. 132, § 1.

18. The Court below, the United States District Court for the Northern District of California, Southern Division, was the reorganization court. 34 F.Supp. 493. It therefore had the power to set aside the decree in reorganization, 11 U. S.C.A. §§ 11, sub. a(8), 205, sub. (l), and administer this unadministered asset. Incidentally, the defendant cannot escape under any theory since it is under bond to pay all claims against the trustees.

19. The stipulation of the parties was that a fund was paid into Court by plaintiff and therefore it must be returned to plaintiff's possession, unless some affirmative proof showed defendant was entitled thereto. The Trial Court held: "But, as between the parties, no persuasion of conscience or equity impels me to do otherwise than to leave the parties where

stipulation, plaintiff "as agent" was trustee of an express trust and, as such, had a right to deposit the fund and ask for a determination of the rights of all parties thereto, as in the nature of interpleader. Plaintiff affirmatively demanded findings upon this feature, and the Trial Judge refused to make them. A stipulation of parties to litigation that a fund is deposited in court is sufficient. The Court must give affirmative directions that the fund be paid to the proper party.[20] Before such a judgment be entered, findings of fact are required. It is assigned as error that the Trial Judge refused to make findings on this point. The Rule requires findings of fact. This is error requiring reversal. The judgment here against plaintiff did not end the case. According to the very record before us, there is still a fund in the Trial Court which has not been distributed.

Fourth, we need not go so far afield. If we disregard control of the officers[21] of plaintiff by defendant, the ownership of the stock and the appurtenant right to file returns and the presence of a trust fund, still a cause of action was proven prima facie[22] by facts which the Trial Court did find. We need only to be sophomorical enough to remind ourselves that, where one, at the special instance and request of another, does an act and benefit accrues to the one who made the request, the legal result is so standardized that for centuries it has been stated in one of the common counts.[23] Here there were two independent corporations at the time of the settlement of tax liability. They were capable of contracting with each other. Neither was longer connected with the other. Plaintiff, at the request of defendant long after the reorganization had been closed, entered into a settlement with the United States, whereby its losses were used to obtain a benefit of $17,000,000.00 for defendant. Plaintiff was not bound to refuse consent to the filing of consolidated returns. It would seem, therefore, that sufficient facts are shown so that, in an action on the claim, plaintiff should recov-

they are, the defendant with its amazing and undeserved tax success; the plaintiff, as the reorganization * * * left it, without interest in the debtor." Instead of restoring the parties to status quo ante, the Trial Court affirmatively awarded this fund to defendant. But no findings to sustain affirmative award are present.

20. Rule 67, Federal Rules of Civil Procedure; 28 U.S.C.A. §§ 2041, 2042; Governor of Georgia v. Madrazo, 1 Pet. 110, 26 U.S. 110, 121, 7 L.Ed. 73; United States v. Morgan, 307 U.S. 183, 193, 59 S.Ct. 795, 83 L.Ed. 1211; Osborn v. United States, 91 U.S. 474, 479, 23 L.Ed. 388.

21. As to the nature of the confidential relationship involved, where corporations have officers in common, see cases collected in annotation in 114 A.L.R. 299.
 "It [a constructive trust] arises where one person acquires title to property from another by an abuse of a fiduciary or confidential relation between them * * *." Restatement of Restitution, § 166, Comment d. 3 Scott on Trusts, § 648, p. 2336. Johnson v. Umsted, 8 Cir., 1933, 64 F.2d 316; Johnson v. Clark, 1936, 7 Cal.2d 529, 61 P.2d 767; Duncan

v. Dazey, 1925, 318 Ill. 500, 149 N.E. 495; Theis v. Vonderheyden, 1922, 94 N. J.Eq. 317, 119 A. 502, Id., 94 N.J.Eq. 807, 121 A. 927.

22. Other grounds for constructive trust, which it is possible for the trier of the fact to find upon the basis of evidence in the record, are fraud (Restatement of Restitution, § 166, Comment b; Templeton v. Hollinshead, 119 Or. 620, 250 P. 747), mistake (Restatement of Restitution, §§ 49, 170; 3 Scott on Trusts, § 468), and conversion or misappropriation, (Burke Grain Co. v. St. Paul Mercury Indemnity Co., 8 Cir., 94 F.2d 458; Pioneer Mining Co. v. Tyberg, 9 Cir., 215 F. 501, L.R.A.1915B, 442.) As noted in the text following, a trust need not be worked out in all probability since simpler theories may serve for recovery.

23. Matarese v. Moore McCormack Lines, 2 Cir., 158 F.2d 631, 170 A.L.R. 440 and note; Corbin on Contracts, § 1112; 1 Williston on Contracts, § 41, p. 115; Costigan, Implied in Fact Contracts and Mutual Assent, 33 Harv.L.R. 376; Burton v. Burton Stock Car Co., 1898, 171 Mass. 437, 50 N.E. 1029; Ft. Wayne, C. & L. R. Co. v. Haberkorn, 1896, 15 Ind. App. 479, 44 N.E. 322.

er (quantum meruit) [24] as much as the service was worth. Findings as to any affirmative defense should be specific.

If defendant had emerged sufficiently from reorganization to pay its own attorneys $300,000.00 for the same service, it is difficult to see how the reorganization decree prevents defendants from compensating plaintiff at least for what the services were worth, which were rendered at its request and which resulted in benefit to it.

Fifth, it seems clear that definitive findings must be made on other phases in order to deny plaintiff a much broader recovery. An argument is made that plaintiff is a fiduciary as respects defendant. The tax statute provides that plaintiff could use its loss of $75,000,000.00 to offset the earnings of the reorganization trustees and thereby obtain a remission of taxes for the reorganized company. Without the loss to plaintiff, the statute would not have applied. Without consent of plaintiff, neither could consolidated returns have been filed nor settlement made. The tax statute does not go farther and lay down any rule for allocation of the benefits obtained from a remission of taxes. The principles of equity should control division.[25] It is said, although there are no findings, that the history of prior consolidated returns is controlling.[26] Of course, it cannot probably be shown how plaintiff heretofore dealt with a consolidated return after there had been a divorce from a subsidiary. If we look at it realistically, but little question arises. If plaintiff were still the owner of the stock of defendant, then the allocation of the $17,000,000.00 to defendant would be reflected in the increased value of its stock. The transfer of the stock left the right untouched. Since increase in value of stock in defendant no longer is of avail to plaintiff, there should be another method of applying the remission to the loss.

Finally, it may be, as the Trial Court said, that there is an overwhelming public policy which dictates that the reorganized company should be left alone as owner of the "amazing and undeserved tax" [85 F. Supp. 875] remission. But, before we, as Judges, take this sole remaining asset without compensation from stockholders of the plaintiff, who bore the losses, and give it as a surplus to distribute to the stockholders of the reorganized company, we should set out in clear and specific findings of fact the exact steps by which we accomplish such a result.

The cause should be reversed in order to permit adequate findings to be made.

On Petitions for Rehearing

PER CURIAM.

The petitions of the appellants and intervenors for a rehearing are denied. Insofar as the petitions seek a rehearing en banc, they are stricken as being without authority in law or in the rules or practice of the court. See Kronberg v. Hale, 9 Cir., 181 F.2d 767.

JAMES ALGER FEE, District Judge (dissenting and suggesting a rehearing en banc of all Circuit Judges).

This cause involves the disposition of over $21,000,000. The solution requires application of novel statutory language affecting the fields of bankruptcy and taxes. I have expressed myself heretofore and still feel that the findings of the lower court do not support the determination made by two judges on the panel here.

I am unable to agree with either the denial of rehearing or the striking of the petitions which ask for a rehearing by the

---

24. Assumpsit would lie even though the Trial Court made findings of misappropriation, embezzlement and conversion. Reynolds v. New York Trust Co., 1 Cir., 188 F. 611, 39 L.R.A.,N.S., 391; Terry v. Munger, 1890, 121 N.Y. 161, 24 N.E. 272, 8 L.R.A. 216, 18 Am.St.Rep. 803; Conaway v. Pepper, 1919, 7 Boyce, Del., 511, 108 A. 676; Roberts v. Evans, 1872,

43 Cal. 380; consult annotation 97 A.L.R. 250 and text treatment 1 C.J.S., Actions, § 50(b).

25. Restatement, Restitution, §§ 1, 81; Phillips-Jones Corporation v. Parmley, 302 U. S. 233, 58 S.Ct. 197, 82 L.Ed. 221.

26. See Note 8, supra.

full complement of Circuit Judges of this Court en banc. Two District Judges and one Circuit Judge constituted the panel which heard the case. As has been pointed out in this serious and important litigation, three District Judges have, respectively, expressed three widely divergent views, while no member of the Court of Appeals has written a line on the merits.

I therefore suggest to the Court of Appeals a rehearing en banc of all the Circuit Judges. For this there is precedent in this Circuit.[1] The practice, as I understand it, substantially accords with that of the Third Circuit,[2] which is admirable. Inasmuch as this might be the court of last resort in this case, it seems fairer to have the issues disposed of by Circuit Judges.

The Supreme Court of the United States at least once has given permission to an appellant to apply to this court for a hearing en banc. 316 U.S. 649, 62 S.Ct. 1301, 86 L. Ed. 1732.[3] In taking that action, reference was made to Textile Mills Securities Corporation v. Commissioner of Internal Revenue, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249.

In Re Petition of Western Pacific Railroad Corporation for Leave to File a Motion Denominated "Motion To Vacate Order Striking Appellant's Petition For Rehearing En Banc and Reinstating Such Petition."

Before DENMAN, MATHEWS, STEPHENS, HEALY, BONE, ORR, and POPE, Circuit Judges.

1. Judges Denman, Mathews, and Stephens sat in Hopper v. United States, 9 Cir., 142 F.2d 167, and Judges Wilbur, Denman and Healy sat in Crutchfield v. United States, 9 Cir., 142 F.2d 170. At page 177 of 142 F.2d appears Circuit Judge William Denman's motion for a rehearing en banc of the Hopper case, supra, wherein it is stated that the cause is "now pending on petition for rehearing in this court". Accordingly, the rehearing of that case was held en banc before Judges Wilbur, Garrecht, Denman, Mathews, Stephens and Healy, being all of the Circuit Judges of this Court. Hopper v. United States, 9 Cir., 142 F.2d 181.

2. United States v. Gallagher, 3 Cir., 183 F.2d 342, was heard by a panel of two

HEALY, Circuit Judge.

Case No. 12,506, supra, upon its coming at issue in this court, was regularly assigned for hearing and determination to a court or division of three judges comprising Circuit Judge Healy and District Judges Fee and Byrne. Subsequent to argument and submission of the case the court handed down an opinion and order affirming the judgment of the district court, Judge Fee dissenting. Thereafter the appellants petitioned for "rehearing and rehearing en banc," and the court on January 30, 1952, denied the petition, Judge Fee again dissenting. Insofar as the petition sought a rehearing in banc it was ordered stricken as unauthorized by law or practice.

On March 10, 1952, the Western Pacific Corporation presented the petition for leave described in the caption. In its supporting brief it asserts that it is its right under the law to have its petition for rehearing considered and acted upon by all the circuit judges. On order of a majority of the circuit judges, the court has been assembled in banc for the purpose of announcing the principles of law and practice it deems applicable in respect of in banc hearings. This course is thought appropriate in order that litigants and the bar may be advised not only of the position taken by the court but of the reasons for it.[1]

The governing statutory provision, 28 U.S.C.A. § 46(c), reads:

"(c) Cases and controversies shall be heard and determined by a court

Circuit Judges and one District Judge, and, upon suggestion of one of the Judges, was heard en banc by all Circuit Judges.

3. See Robinson v. Johnston, 9 Cir., 130 F. 2d 202.

1. In recent years it has become the custom of counsel almost as a matter of course to petition the full membership of the court for a rehearing in banc, upon suffering an adverse decision at the hands of a court of three judges. This hopeful concept of the right of litigants appears to stem from declarations in the dissenting opinion in Independence Lead Mines v. Kingsbury, 9 Cir., 1949, 175 F.2d 983, at page 992, certiorari denied 338 U.S. 900, 70 S.Ct. 249, 94 L.Ed. 554, to the effect that two judges in a court or divi-

or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in active service. A court in banc shall consist of all active circuit judges of the circuit." [2]

The obvious intendment of this statute is to perpetuate the United States Courts of Appeals as courts of three judges in all cases save those in which an in banc hearing is ordered by all or a majority of the circuit judges. No doubt Congress was fully alive to the fact that these courts, despite the increase in their membership, would be unable to keep abreast of the constantly growing volume of judicial business unless they continued in all normal circumstances to function as courts of three.

Important light will be shed on the problem under inquiry if we examine the method pursued in the assignment of cases, as prescribed by our Rule 4.[3] In practice the calendars for the court are tentatively made up by the chief judge in collaboration with the clerk. On these calendars each case is assigned for hearing and determination to a court or division of three named judges, unless it has been otherwise ordered. The proposed calendar is circulated among all the judges, and any designation or assignment may be modified or set aside by a majority. When the calendar is approved by the judges their action is uniformly manifested by their initialing the same, as is done in the case of court orders generally. Thus the calendar as finally adopted evidences or necessarily implies at least the tentative determination of the judges that the cases assigned to courts of three are not of such character as to warrant their being heard before the court in banc. In the instances in which at the time of assignment it is agreed by all or a majority of the judges that a particular case should be heard and determined in banc, it is calendared as such.[4] It some-

---

sion of three are without authority to pass upon or deny a petition for rehearing addressed to all the circuit judges.

The numerous petitions of this nature have been disposed of by the court or division concerned either (1) by ignoring the application for in banc action and treating the petitions simply as ordinary petitions for rehearing, or (2) by striking them insofar as they sought in banc action. The treatment has not in the least served to discourage losing counsel or to stem the growing tide of such petitions.

2. The section was enacted as part of the 1948 Judicial Code revision. In its entirety it reads as follows:

"§ 46. Assignment of judges; divisions; hearings; quorum

"(a) Circuit judges shall sit on the court and its divisions in such order and at such times as the court directs.

"(b) In each circuit the court may authorize the hearing and determination of cases and controversies by separate divisions, each consisting of three judges. Such divisions shall sit at the times and places and hear the cases and controversies assigned as the court directs.

"(c) Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in active service. A court in banc shall consist of all active circuit judges of the circuit.

"(d) A majority of the number of judges authorized to constitute a court or division thereof, as provided in paragraph (c), shall constitute a quorum."

3. Rule 4, subdivisions 1 and 2, reads:

"Assigning of Causes for Hearing

"1. The calendars of the court shall be made up by the Clerk under the direction of the Chief Judge subject to the approval of the majority of the judges.

"2. The Chief Judge after conference with the Circuit Judges shall designate and assign the judges who are to hear the causes placed upon the calendars of the court; such designation or assignment may be modified or set aside by a majority of the judges."

4. Since the decision in Textile Mills Securities Corp. v. Commissioner, 1941, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249 approximately thirty cases in all have been heard in banc in this circuit. Nineteen of these, or about two-thirds of the whole, were assigned to the court in banc at the time they were originally calendared. Perhaps more than half of the nineteen were cases of great public consequence, such, for example, as those growing out of the suspension during the

times occurs, too, that examination of a case preliminary to hearing, or consideration of it after argument, leads the judges to whom it was assigned to conclude that it is an appropriate cause for in banc consideration, and they so indicate to the remaining judges. If the latter or a majority of all agree, the case is then reassigned for hearing by all the judges.[5]

If we examine the status of Case No. 12,506 in the light of this practice, it becomes apparent that it was calendared and heard by court order as one in which in banc consideration was not deemed requisite. There remains to inquire whether the losing party in the cause is at this juncture entitled as of right to have its petition for rehearing considered and ruled upon by a court composed of all the circuit judges.

■ The statute, it will be recalled, commits to a "court or division of not more than three judges" the power to *hear* and *determine* the cases and controversies assigned to it. Obviously its determination of any such case or controversy is a decision of the Court of Appeals, and as such is a final decision, subject to review only as prescribed by 28 U.S.C.A. § 1254. Circuit judges other than those designated to sit on such court or division are not members of it, and officially they play, and are entitled to play, no part in its deliberations at any stage. That this is so is made clear by subdivision (a) of § 46, see Note 2 above, providing that "Circuit judges shall sit on the court and its divisions in such order

and at such times as the court directs." If regard be had for this mandate circuit judges may not intrude themselves, or be compelled on petition of a losing party to intrude, upon a court or division on which they have not by order of the court been directed to sit.

A petition for rehearing in any such case, whatever its form or wording, must necessarily be treated as addressed to and is solely for disposition by the court or division to which the case was assigned for determination. If the court so constituted, or a majority of its members, denies the petition, that ends the matter so far as concerns the Court of Appeals. If it grants a rehearing it may follow either of two courses: (a) it may, and in all ordinary situations does, rehear the case itself; or (b) it may for reasons thought adequate suggest to the nonparticipating judges that the case is one which ought to be reheard in banc; and if all or a majority of the circuit judges agree, the case is then placed on the calendar for in banc consideration.[6]

■ Adoption of the view currently being urged would render merely tentative or provisional the decisions of the court in 98 per cent or more of the cases that come before it. On petition of a dissatisfied party its decisions would automatically be subject to a species of horizontal appeal which would completely nullify the prime statutory objective of effecting a division of the court's work. The judges other than those to whom the cases had been assigned would perforce be required to acquaint

war of the writ of habeas corpus and the institution of martial law in Hawaii, or cases involving the forcible removal of the Japanese from the Pacific Coast states. Others were contempt matters involving claimed violations of the constitutional prohibition against self-incrimination.

There are no definite criteria that we know of by which to determine what cases are suitable for in banc consideration. However, causes of extraordinary public importance or those involving constitutional questions probably belong in the category.

5. McCoy v. United States, 9 Cir., 169 F.2d 776; Samuel v. United States, 9 Cir., 169 F.2d 787; Tee Hit Ton Tribe v.

Olson, 9 Cir., 160 F.2d 525; Los Angeles Building & Construction Trades Council v. LeBaron, 9 Cir., 185 F.2d 405; Price v. Johnston, 9 Cir., 159 F.2d 234, Id., 9 Cir., 161 F.2d 705.

6. This was the course followed in Hopper v. United States, 9 Cir., 142 F.2d 181; Southern Pacific Co. v. Guthrie, 9 Cir., 180 F.2d 295, Id., 9 Cir., 186 F.2d 926; Evaporated Milk Ass'n v. Roche, 9 Cir., 130 F.2d 843; and Pacific Gas & Electric Co. v. Securities and Exchange Comm., 9 Cir., 139 F.2d 298. In the Hopper case, supra, and to a lesser degree in Southern Pacific Co. v. Guthrie, intracircuit conflicts were resolved. The other two cases cited in this note were nondescript matters.

themselves with the issues and problems involved in the same painstaking manner as did their associates who had heard and determined the causes initially, and this without the latter's advantage of having heard oral argument. Obviously, unless he is prepared to stultify himself, no judge would undertake to rule upon petitions for rehearing without adequate and full study and investigation of the merits.

On these considerations and in harmony with its understanding of the statutory scheme, the court has consistently retained to itself as a matter of administrative and intramural concern only the problem whether or not any given case should be heard or reheard in banc. Accordingly, in the exercise of its uncontrolled discretion the court has declined altogether to entertain petitions of litigants for such hearings. The position it takes is that, apart from the possible disqualification of a judge, the composition of the court to which a case may be assigned for determination is a matter wholly outside the province of the parties.

It has been remarked by some commentators that the procedure outlined by Congress for the Courts of Appeals involves a distinct hazard of intracircuit conflicts. The hazard, we think, may easily be overestimated. It is minimized by the alertness of counsel and by informal and unofficial interchanges among the judges. Where conflicts occur they are capable of remedy by in banc action without wholesale duplication of effort, as our own practice and experience have demonstrated.

The petition for rehearing in this cause has already been authoritatively denied by the division to which the cause was assigned. The petition for leave to file, addressed to the court in banc, is denied.

From this time forward petitions, if any, for rehearing in banc in cases determined by divisions of three judges will be considered and disposed of by the latter as ordinary petitions for rehearing.

DENMAN, Chief Judge, dissenting from the court's holding that the circuit judges not participating in a division, here six of the seven such judges, (a) are without power to consider a litigant's petition for a rehearing en banc, and (b) where a rehearing or rehearing en banc has been denied by a division, are without power to vote to grant a rehearing en banc, if two of the division's judges, here with but one circuit judge, do not desire such a rehearing. This appears from the following language of the opinion:

"A petition for rehearing in any such case, whatever its form or wording, *must necessarily* [1] be treated as addressed to and is *solely* for disposition by the court or division to which the case was assigned for determination. If the court *so constituted,* or a majority of its members, denies the petition, *that ends the matter so far as concerns the Court of Appeals.* If it grants a rehearing it may follow either of two courses: (a) it may, and in all ordinary situations does, rehear the case itself; or (b) it may for reasons thought adequate *suggest to the nonparticipating judges that the case is one which ought to be reheard in banc;* and if all or a majority of the circuit judges agree, the case is then placed on the calendar for in banc consideration.

\* \* \* \* \* \*

"The statute, it will be recalled, commits to a 'court or division of not more than three judges' the power to *hear* and *determine* the cases and controversies assigned to it. Obviously *its* determination of any such case or controversy is a decision of the Court of Appeals, and as such is a *final decision, subject to review ONLY as prescribed by 28 U.S.C.A. § 1254.*" Thus squarely is denied the power of the court en banc to review a division's decision in a "rehearing en banc \* \* \* ordered by a majority of the circuit judges." See 28 U.S.C. § 46(c).

"From this time forward petitions, if any, for rehearing in banc in cases determined by divisions of three judges will be considered and disposed of by the latter as ordinary petitions for rehearing."

In this case the Western Pacific Railroad Corporation, hereafter the Corporation, pe-

---

1. Emphasis hereafter appearing in quoted matter is supplied.

titions the Court en banc for leave to file a petition for a rehearing en banc. The latter seeks to establish, inter alia, that the judgment of the division which heard the case decided the main issue therein contrary to the decision of a prior division of this court.

The division in the instant case, consisting of one circuit judge and two district judges, has ordered "stricken" a petition addressed to the seven judges constituting the court en banc. This order follows a precedent of similar strikings of petitions for rehearings en banc in the cases of Kronberg v. Hale, 9 Cir., 181 F. 2d 767; Fruehauf Trailer Co. v. Myers, 9 Cir., 181 F.2d 1008; Northwestern Mut. Ins. Co. v. Gilbert, 9 Cir., 182 F.2d 256.

Since Kronberg v. Hale, the Clerk has distributed no petitions for rehearings en banc to the non-participating circuit judges. From a casual remark of counsel in a social contact, I learned of the Corporation's instant petition and instructed the Clerk to distribute it to the six circuit judges not sitting in the division. But for this casual discovery and my suggestion that the stature and determination of the Corporation's counsel made it likely they would seek mandamus in the Supreme Court, the petition would have had the "striking" treatment of the above cases.

The court's opinion came after a conference originally called for the consideration of the adoption of the rule considered last in this dissent, which would have made the burden of such petitions one we easily could bear.

A. *The court's decision violates (as well as ignores) the Supreme Court's decision in United States ex rel. Robinson v. Johnston, 316 U.S. 649, 650, 62 S.Ct. 1301, 86 L.Ed. 1732, a decision aimed to settle differences in the circuit's divisions.*

The case of Textile Mills Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249, held that notwithstanding the three-judge provision of section 212 of title 28 U.S.C., 1940 ed., a court of appeals might lawfuly consist of a greater number of judges, and that the five active circuit judges of the third circuit might sit in banc for the determination of an appeal.

The Third Circuit in C.I.R. v. Textile Mills Securities Corp., 117 F.2d 62 at page 70, in holding that its five circuit judges could sit en banc, states that otherwise they would not have the power to correct differing views of the judges in the divisions of the court such as the Supreme Court describes as occurring in the Fifth Circuit in John Hancock Mut. Life Ins. Co. v. Bartels, 308 U.S. 180, 181, 60 S.Ct. 221, 84 L.Ed. 176.[2]

The Supreme Court in its Textile Mills case, 314 U.S. at page 334, 62 S.Ct. at page 277, in affirming the Third Circuit and overruling our decision in Lang's Estate v. C. I. R., 97 F.2d 867, 869, where we held we could not sit en banc where two divisions of the court differed as to the law controlling, states of rehearings en banc[3] that:

"* * * Certainly, the result reached makes for more effective judicial ad-

2. Following this the Textile Mills case states at page 71 of 117 F.2d:
"* * * Where, however, there is a difference in view among the judges upon a question of fundamental importance, and especially in a case where two of the three judges sitting in a case may have a view contrary to that of the other three judges of the court, it is advisable that the whole court have the opportunity, if it thinks it necessary, to hear and decide the question. * * *"

3. What is said of the need of rehearings en banc for the then Third Circuit applies a fortiori today to the Ninth Circuit. The Third Circuit in the 1941 fiscal year had but five judges and 285 docket-

ings. The Ninth Circuit has had an increase in population of six million in twelve years. In the fiscal year 1952 it had 446 docketings. On the national average of docketings for circuit judges the Ninth Circuit should have ten judges. It has seven judges but the Senate has passed a bill increasing the judgeships to nine and the House Judiciary Committee has agreed they are needed. No doubt within a year we will have nine judges with three divisions sitting simultaneously. That is to say, we have 56% more docketings and will have almost half again the number of divisions in which exist the hazard of conflicting decision referred to in the Textile Mills decisions.

1018

ministration. Conflicts within a circuit will be avoided. Finality of decision in the circuit courts of appeal will be promoted. Those considerations are especially important in view of the fact that in our federal judicial system these courts are the courts of last resort in the run of ordinary cases. * * *"

In enacting 28 U.S.C. § 46(c) Congress codified the Textile Mills decision, the Reviser's Notes stating that that section "preserves the interpretation established . by the Textile Mills case."

Prior to this codification of the Textile Mills decision, there was decided by one division of this circuit the case of U. S. ex rel. Robinson v. Johnston, 9 Cir., 118 F.2d 998, and later in a division of three other judges, the case of Crockett v. United States, 9 Cir., 125 F.2d 547. The two divisions differed on the controlling law. Certiorari was sought in the Robinson case before the Crockett case was decided and it was denied. A petition for rehearing in the Supreme Court was denied. The Crockett case was then called to the attention of the court in a second petition for rehearing which was granted. The order denying the petition for certiorari was set aside and the writ of certiorari granted. Certainly this action of the Supreme Court was purposeful and deliberate.

In granting certiorari the Supreme Court in United States ex rel. Robinson v. Johnston, 316 U.S. 649, 62 S.Ct. 1301, 86 L.Ed. 1732, held it was the duty of this court en banc to entertain a petition for leave to file a petition for rehearing en banc, for it vacated our judgment and remanded the case to us, stating:

"* * * In view of the conflict of views which has arisen among the judges of the Ninth Circuit with respect to the decision in this case (see U. S. ex rel. Robinson v. Johnston, 118 F.2d 998, 1001, and Crockett v. United States, 125 F.2d 547, 548, 549), and in view of this Court's decision in Waley v. Johnston, 315 U.S. 101, 62 S.Ct. 964, 86 L.Ed. [1302], reversing 9 Cir., 124 F.2d 587, the judgment is vacated, and the case is remanded to the Circuit Court of Appeals for further proceedings, including *leave* to petitioner to

apply for a hearing before the court *en banc*. See Textile Mills Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. [249]. * * *"

The Corporation strongly urges the above contentions in its denied petition, all of which is ignored in this court's opinion. Instead it is said of the seeking of the leave to file the petition, that consideration of such action by any of the circuit judges not in the division (here six) would be "to *intrude* upon a * * * division on which they have not by order of the court been directed to sit."

How absurd it was, one must conclude, for the Supreme Court to order such an intrusion in U. S. ex rel. Robinson v. Johnston!

**B.** *The cavalier refusal of the court to consider the contentions of the corporation's petition.*

The shabby treatment of the litigant and his counsel in refusing to consider their contentions and authorities comes after the court's claim that its opinion gives consideration to *"the principles of law * * * which it deems applicable to en banc hearings."*

No self respecting federal judge sleeps comfortably if he is conscious of having rendered an opinion deciding a case in which he has *purposely* failed to consider a substantial contention supported by authorities submitted to him and by such evasion has based his decision on a ground directly opposed to the evaded contention.

A possible explanation for the silent treatment of the litigant's contention and authorities in this case is that U. S. ex rel. Robinson v. Johnston was deemed irrelevant because decided before the codification of the Textile Mills case in 28 U.S.C. § 46(c). That seems absurd, however, for the Supreme Court's construction of a law before its exact codification, as here, is applicable after codification. Otherwise, why in 28 United States Code Annotated are there the thousands of citations in sections of the Judicial Code, enacted in 1948, which codifies the then law and statutes?

**C.** *The opinion's absurd misstatements respecting the assignment of cases to the court's divisions.*

The *opinion states*:

"* * * Thus the calendar as finally adopted *evidences* or necessarily implies at least the *tentative predetermination* of the judges that the cases assigned *to courts of three are not of* such character as to warrant their being heard before the court in banc * * *."

The Supreme Court in the Textile Mills case has established a definite criterion for the rehearings en banc provided for in 28 U.S.C. § 46(c). It is the only one there stated, though there are others. It is that conflicts of law between the decisions of two of the court's divisions are cause for rehearing en banc. By clearing the law en banc, the circuit does so for the 96.3% of litigation in which this court's decisions are final.

Such en banc action prevents the burden on the Supreme Court, such as in the certification of the question of such differing divisions in Lang's Estate v. C. I. R., 3 Cir., 97 F.2d 867, 869, a burden the Supreme Court later refused to assume in its return of U. S. ex rel. Robinson v. Johnston for our en banc consideration of our divisions' divergencies.

It is almost a rude question to ask, "How, in heaven's name, are the seven judges en banc to know tentatively or otherwise that the division to which they assign the case will thereafter decide it without conflict with a prior decision of a different division"? The phrase, "How, in heaven's name," is used advisedly, for our tentative decision would require divine omniscience.

The opinion states that another criterion is whether the case to be assigned to a division is "one involving constitutional questions."

The slightest reflection shows that the court en banc could make its tentative assignment of a case to a division because *not* involving a constitutional question only by examination of all the briefs in all the cases to be assigned to determine whether such a constitutional contention is at issue.

Were this truly what we have done, it would have involved a volume of judicial effort comparable to that the court's opinion seeks to avoid with petitions for rehearings en banc.

In the eleven years since the Textile Mills case, the Clerk advises, we have assigned to division over two thousand two hundred cases. In but nineteen cases, less than one per cent, have they been assigned to the court en banc. These were cases whose extraordinary importance had wide newspaper notoriety. In *none* of the remaining two thousand two hundred cases has the court en banc assigned them to division after an examination of the briefs for that purpose.

D. *Further to avoid considering the corporation's contention and authorities, the opinion misstates the source of the contention that rehearings en banc are needed to cure the divergence of divisions.*

On the source of this contention the court's opinion states, "It has been remarked by *some commentators* that the procedure outlined by Congress for the Courts of Appeals involves a distinct hazard of intracircuit conflicts."

"Some commentators"! To what extent will the court go in order to avoid mentioning that this hazard was stated first by the Third Circuit in the Textile Mills case and on its appeal by the Supreme Court, and later implicitly by the Supreme Court in returning, U. S. ex rel. Robinson v. Johnston to this court because of the difference in viewpoint of our divisions. That is to say, in such holdings on the criterion of divergence, the Third Circuit and the Supreme Court are no more than mere commentators.

The opinion seeks to minimize the likelihood of a division overruling sub silentio a prior division's holding and this with the certainty of nine judges and three divisions in the near future.[4] The idea is that the judges in the division so acting, "by *in*formal and unofficial interchanges" with the nonparticipating judges, will advise the latter that the decision is at variance with that of a prior division. In my seventeen

4. See footnote 3, supra.

years on the bench I have had no associate so confess his mistaken act.

An examination of the three cases cited, supra, the Kromberg, Fruehauf Trailer and Northwestern Mutual cases, in which the petitions for rehearing en banc were stricken, shows that two of them were founded on such conflict of divisions and the third on conflicts in district court decisions on important matters. Also in the seven cases of Bradley Mining Co. v. Boice, 9 Cir., 194 F.2d 80; Acheson v. Kuniyuki, 9 Cir., 189 F.2d 741, 190 F.2d 897; Independence Lead Mines Co. v. Kingsbury, 9 Cir., 175 F.2d 983; Tanimura v. United States, 9 Cir., 195 F.2d 329; People of State of California v. United States, 9 Cir., 181 F.2d 598; Sunbeam Lighting Co. v. Sunbeam Corp., 9 Cir., 183 F.2d 969, and Zamloch v. United States, 9 Cir., 193 F.2d 889, the division judges refused consideration of the petition addressed to the seven and thus prevented the court en banc from considering the contention in each that the division's decision conflicted with the decision of a prior division.

E. *The court's confessed fear of the burden of an overwhelming volume of such petitions may be avoided by an amendment of its rules.*

Against a flood of such petitions we can protect ourselves, as has the Supreme Court, by amending our Rule 25 as follows:

### "Rule 25.

#### "Rehearing

"A petition for rehearing of a decision by a division of the court may be presented within 30 days after judgment. It must be printed, and briefly and distinctly state its grounds, and be supported by certificate of counsel that in his judgment it is well founded and that it is not interposed for delay. Twenty printed copies must be filed with the clerk of this court.

"Where there has been a denial of a rehearing of a decision by a division, a petition for a rehearing in bank may be filed within fifteen days. The petition shall be in the form above described and with the same certificate of counsel. No petition will be entertained, unless one of the judges participating in that decision shall join in seeking such rehearing."

The Supreme Court has similarly protected itself on its petitions for rehearing by a provision in its Rule 33, 28 U.S.C.A., of which the pertinent portion is:

"Such petition * * * will not be granted, unless a justice who concurred in the judgment or decision desires it, and a majority of the court so determines."

In the last seven years there have been but 75 dissents, an average of less than 11 per year. Probably less than 11 judges per year would join in petitioning for a rehearing en banc.

In view of our prospective three divisions and the likely need for such rehearings en banc, an average of eleven such petitions would not be an intolerable burden, less than 4% of our submitted cases. It would substantially reduce the likelihood of conflict between the divisions.

By requiring first a rehearing by the division, the district judges would not be barred from the reconsideration of a decision.

The motion to file should have been considered on its merits and granted.

Supplement to dissenting opinion of Chief Judge DENMAN, filed herein on July 9, 1952.

DENMAN, Chief Judge.

Since the writing of my dissenting opinion herein I have been advised by Chief Judge Harold M. Stephens of the United States Court of Appeals for the District of Columbia that that court has rendered a series of decisions in conflict with the decision of this court on the question of the right to consider a petition or motion for rehearing in banc where made by a litigant alone or by a single judge in the division which has decided the case.

It thus appears that this case is of the character described in Rule 38, subd. 5(b) of the Supreme Court, 28 U.S.C. The decisions of the Court of Appeals for the District of Columbia determining its practice there are those contained in the following communication to me from Chief Judge Stephens:

"Washington, D. C.
September 11, 1952.

Honorable William Denman
Chief Judge
U. S. Court of Appeals
United States Post Office and Courthouse
San Francisco

My dear Judge Denman:

In response to your inquiry regarding the practice in this court with respect to hearings in banc and rehearings in banc under the provisions of Section 46 of Title 28 of the United States Code, I wish to advise as follows:

In determining in which cases to sit in banc, two methods have been followed in the United States Court of Appeals for the District of Columbia Circuit, namely:

/1/ Any judge or judges or any division of the court may request that a case be heard originally or reheard in banc. Such judge or judges or division of the court usually addresses a memorandum to all of the active circuit judges indicating why he or they thinks the case should either be heard or reheard in banc, and requests the judges to notify the chief judge of their votes on the request. If a majority favor the in banc hearing, and order to that effect is entered and the case is scheduled for the in banc hearing or rehearing.

/2/ Any party to a case may by written motion or petition request that the original hearing or a rehearing to be held in banc. Such a motion or petition is submitted to and ruled upon by all of the active circuit judges of the circuit.

In the following cases rehearings in banc were ordered on the request of one member of the division of the court which originally heard the case:

No. 10446, Kephart v. Kephart, U.S. App.D.C., 193 F.2d 677.

No. 11081, Quinn v. U. S. Not yet decided.

No. 10943, Emspak v. U. S. Not yet decided.

In the following case rehearing in banc was ordered on the request of a judge not a member of the division which originally heard the case:

No. 10063, Stewart v. Overholser, 87 U.S. App.D.C. 402, 186 F.2d 339.

In the following cases the original hearings in banc were ordered on the request of the original division:

No. 11039, Thompson Co. v. D. C. Not yet decided.

No. 11044, D. C. v. Thompson Co. Not yet decided.

In the following case the original hearing in banc was ordered on the request of one member of the court:

No. 10473, Overholser v. Boddie, 87 U.S. App.D.C. 186, 184 F.2d 240, 21 A.L.R.2d 999.

In the following cases rehearings in banc were ordered on the petition of one of the parties:

No. 10504, in the Matter of John W. Carter, U.S.App.D.C., 192 F.2d 15.

No. 10854, Columbia National Bank v. D. C., U.S.App.D.C., 195 F.2d 942.

No. 10846, Citizens Bank v. D. C., U.S. App.D.C., 195 F.2d 946.

No. 10835, D. C. v. Catholic Education Press, U.S.App.D.C., —— F.2d ——.

Very truly yours,
/s/ Harold M. Stephens
Chief Judge of the United States Court of Appeals for the District of Columbia Circuit."

It is ordered that the above opinion be printed as a part of the record in this case and that a properly certified copy be sent to the Supreme Court of the United States as a part of the certiorari proceedings sought by Western Pacific Railroad Corporation.